CHIEF JUSTICE ROBERTSON
delivered the opinion op the court, Judge Hardin dissenting.
Tbe appellant, Peter Blimm, charged with the wanton murder of a little white boy, without any known provocation or apparent motive, was indicted, tried, and sentenced to the gallows at a special term of the Boone Circuit Court, ordered only a few days after the homicide, and commencing on the eighth day after the order was made in vacation.
His appeal to this court, urging various objections to the judgment, asserts in limine that the special term held without the notice prescribed by law was illegal, and that for want of jurisdiction the verdict and judgment against him are void.
If, as thus assumed, the sentence was not a judicial act, this court can not judicially revise and reverse it; and the appellant’s only lawful appeal would be to another depart *322 ment of the government not fettered, as this court is, by inexorable law.
But in our judgment the circuit court had jurisdiction to order the grand jury, and special juries, try the appellant on the indictment found by that grand jury, and sentence him to be hung on the verdict of “ guilty ” by that chosen venire. ■
The following quotations from section 1 and subsection 2 of article 12, chapter 27, Stanton’s Revised Statutes, p. 321, present all that is here material of the statutory law regulating special terms of the circuit courts :
“ Sec. 1. When the business requires it, a circuit judge may hold a special term in any county in his district for the trial of chancery, penal, and criminal causes, or either.”
“ Subsec. 2. If the order be made in vacation for a special term, notice thereof shall be posted up at the courthouse door ten days before its commencement.”
The constructive object.of the prescribed notice decides the question of jurisdiction. Did the legislature intend that ten days’ notice should be indispensable to the jurisdiction, or, in other words, a fundamental condition of the validity of the proceedings of the called term, or intend only that the-requisition of the notice should be merely directory or precautionary ? It seems to us that the latter was the sole purpose. If the former be adjudged to be the legislative purpose, its comprehensive effect would be to make void not only all criminal convictions and preparatory orders and proceedings, but all preparation, orders, and decrees in chancery. This would be vexatious and perilous without adequate notice, and far beyond the prudent policy or presumable aim of legislative wisdom.
The contemplated publication, if attempted as required, might be immediately destroyed, or, if not torn down, might give no actual notice to any person interested. And can it be reasonably presumed that the legislature intended that the *323 jurisdiction of the court should depend on so slight and trivial a circumstance as putting on the court-house door a paper subject to so many accidents, and at best so uncertain and fallible, as a notice to all concerned? Moreover, if the order be made at a regular term, no such notice is required; but the special term may be held without question the next day after the order for it had been entered on the record-book of the court. And even if that order should not be recorded before the commencement of the special term, would the omission vacate the term ? We can not so think. And unless it would the question in this case is concluded. The fact that no extensive notice is required when the order is made in court shows that, when made out of court, the posting of it on the court-house door is required not to give jurisdiction, but only to guard in that way against surprise by what may be publication of the order. Had it been put up as required, the appellant could not have been benefited by it otherwise than by affording him time to escape. He could not have introduced evidence before the grand jury, and the non-publication could at the utmost have operated on him as a surprise which might have entitled him to some postponement of his trial.
The law organizing circuit courts, and fixing the terms during which they shall sit, if necessary, may not deny their inherent power to prolong any of those terms or order special terms without express statutory authority; and the statutes on that subject may have been intended not so much for giving that power as for directing the mode of exercising it. On this hypothesis, which we consider maintainable, no such directory statute gives the jurisdiction, and non-conformity to the prescribed direction can not divest it as pre-existing. But if mistaken in this, we still think that the statute we are now considering is only directory.
The judge who ordered the special term was still judge of *324 the same court when he presided over the trial at the special term. He had pre-existent jurisdiction over such homicide committed in Boone. Consent could not give it, nor opposition divest it. The said subsection 2 also provides that parties may agree to a special term. But unless the court would have jurisdiction without their authority or acquiescence their consent could not give it, and the only object or effect of their consent would be to preclude any pretense of surprise at the holding of the special term. And this clearly indicates that the legislature required the notice not to legalize the special term or give the judge jurisdiction, but solely to prevent surprise; and this is as manifest as if the act, after allowing a special term, had said, “ but for the convenience of parties concerned, and to prevent surprise, the order, if made in court, shall, without other notice, be entered on the record, so that the bar may know it; or, if made in vacation, shall be posted up on the court-house door for ten days.” Could there then be any doubt that it would be the order, and not the quasi notice of it,- that would give the court jurisdiction ? And this is the constructive aim of the act as clearly as if it had been explicitly so declared. The act contains nothing implying that the prescribed publication is the condition on which the special term may be held, or that it shall be a legal nullity without such publication. But the contrary is implied by the context, object, and character of the enactment.
As to jurisdiction therefore the circuit judge had all the judicial power which he could have exercised over this case at a regular term of his court. (In this conclusion Judge Hardin does not concur.) Then we must revise the case within the scope of our circumscribed jurisdiction over judgments in criminal proceedings.
The only contestible question in the record within the range of our appellate power is involved in instructions, and that is confined to the hypothesis assumed on the testimony that *325 when the homicide was perpetrated the appellant was drunk; which fact, according to the ease of Smith v. The Commonwealth, 1 Duyall, 224, to which we adhere, may under peculiar circumstances repelling malice reduce the grade of the crime from murder to manslaughter. But this mitigating tendency of intoxication is not allowable when that condition of mind has been produced for the purpose of stimulating a meditated felony, or even when it is known to excite homicidal or other destructive passions, because such an inebriate, hostis huma/ni generis, evinces express malice. But when, in the absence of any such aggravating circumstances, a responsible being, drunk from accident or mere sensuality, takes human life without rational motive, and which he never would have attempted, but always would have revolted at, when sober and self-poised, the principle of the decision in Smith v. The Commonwealth allows the jury to consider the abnormal condition of the mind and passions so superinduced as a circumstance which, while it should not excuse, may tend to repel the implication of malice essential to the crime of murder.
In this case it appears that the appellant on the day of the homicide had gone to Burlington, and there, drinking much liquor and trying to buy the tincture of cantharides, he acted and talked strangely, and, returning homeward, cut the boy’s throat without any imaginable motive, unless he killed him to conceal a meditated crime on another. But there is now no sufficient clue in the evidence to allow the imputation of such a horrible motive. Proof that he was drunk was pertinent, in this state of case, as a circumstance helping to account for an act otherwise mysteriously inexplicable; and the jury had a right to weigh that fact, and give it its proper effect on the question of motive.
If the jury, on all the facts, had believed that when he killed the boy the appellant had no actual motive; and also that without knowing or having from experience cause to *326 apprehend that what he drank that day might instantly produce delirium, or so inflame the passions .or unhinge the mind as to jeopard human life, which would have been in no danger from his hand had he been perfectly sober and self-possessed; and also that he drank the intoxicating liquor merely for sensual gratification or exhilaration, and not for stimulating some meditated crime; then they might, and perhaps ought to, have found that there was no implied motive, and that therefore the appellant was not guilty of murder, for which he should be hung, but of manslaughter only, for which he should be sent to the penitentiary.
This we consider both sound philosophy and good law; and when prudently applied it illustrates the general principle recognized in Smith v. The Commonwealth.
On the trial several witnesses testified that when much excited by liquor the appellant became partially delirious, gave way to violent passions and insane illusions, often imagining that “somebody was after him,” and twice attempting suicide.
On the foregoing facts, combined with strong proof of the homicide by the appellant, the circuit court by its instructions accurately defined murder and exculpating insanity without any definition of manslaughter, or any other allusion to the appellant’s mental condition than that implied by the instruction on insanity as an excuse for homicide, and which was more favorable in one aspect than the appellant was entitled to expect on the facts and the law; for transient insanity produced by his voluntary act would not, as the instructions implied, excuse, but at the utmost only extenuate, the homicide from murder to manslaughter. Proof of his being drunk could be available to him only for such extenuation, whether his intoxication caused temporary delirium or not. Without resulting in technical insanity, it might, however, have been such as to reduce the grade of a crime so unaccountable by *327 helping to repel implied malice. What he needed most therefore was a specific and full instruction on the subject of mitigation, and not of excuse. But the instructions as given excluded from the jury any consideration of that subject, and consequently the court’s pretermission of it was misleading, and the verdict as rendered was the inevitable consequence, unless he was. insane.
According to the Criminal Code, the presiding judge should, when asked for instructions, give the whole law applicable to all the facts; and this was peculiarly proper in a case so sudden and hurried, and especially as the court, having appointed counsel to defend, should have presented sua sponte to the jury all the law to which the appellant was entitled. But, though the argument in this court has not discussed the mitigating principle, nevertheless the appointed counsel offered on the trial the following instruction: “The jury are instructed that, if they believe from the evidence beyond a reasonable doubt that the prisoner did the killing charged, yet if they believe that he was drunk at the time, they may mitigate the offense from murder to manslaughter.”
That proposition might have been misunderstood or misapplied without some qualification as to the degree of drunkenness, and also as to the counteracting hypothesis of getting drunk to stimulate crime, or of the appellant’s knowledge of the probability that delirium or destructive passion would be the consequence. But the court rejected it without suggesting any modification or giving any other instruction on that subject. In this there was an inadvertent omission which may have been prejudicial to the appellant.
When intoxicating liquor inflames and perverts the passions and blinds the reason, as it often does, a good man may without provocation be unconsciously precipitated into a crime which he had never meditated, and which he never could have attempted when properly sober and self-possessed. To hang *328 him would be a cruel penalty for being drunk — to excuse him would be to encourage vice and disturb social order and security. He should be punished, but not as the secret assassin or highway murderer. The crime in this case, by whomsoever perpetrated, was signally monstrous and mysterious. The perpetrator may have been unconscious of the act or of its guilt, or it may have been prompted by momentary illusion or blind passion beyond control. Why else was the brutal act done? And if so done, the gallows is not, but imprisonment is, the legal retribution.
Then we think that the circuit court ought to have defined malice, express and implied, and discriminated between murder and manslaughter; and then instructed the jury, in substance and effect, that if the accused cut the boy’s throat, his being drunk at the time is no legal excuse, nor even mitigating circumstance, if that condition, however stultifying, was the offspring of meditated crime, or was known to be the parent of passions or delusions dangerous to the lives of other persons; and also that if not so intended or so known, then if the jury should believe that it was the cause of the homicide, which otherwise would not have been perpetrated, they might consider it, with all the other facts conducing to show the existence or non-existence of malice, or fixing the grade of the crime; and that if they should then rationally doubt the imputed malice, they should convict of manslaughter, and fix the period of confinement in the penitentiary.
If thus substantially instructed, the verdict, whatever it may have been, would have been more satisfactory to all concerned, and far more assuring that justice had been fairly and fully done according to the law of the land.
Whatever he may be, or whatever shall or ought to be his doom, it is the duty of this court, as the last judicial resort, to take care, in defiance of all contingent consequences, that he shall have a fair and deliberate trial according to law. *329 The commonwealth wants no more; her interest requires that much, and our duty to her as well as to him demands it.
Wherefore the judgment of conviction is reversed, and the cause remanded for a new trial.