11bu 575
e109 568

11bu 575
f129    505

CASE 55—INDICTMENT, MURDER—DECEMBER 9.

# Nichols v. Commonwealth.

APPEAL FROM BOYLE CIRCUIT COURT.

1. THE COURT OF APPEALS HAS NO POWER TO REVERSE A JUDGMENT of conviction, for error in overruling a motion of the defendant for a continuance.

2. *A continuance should not be granted in a criminal case,* on the application of the defendant, on account of the absence of a witness, when the facts to which it is alleged the witness will swear are admitted by the adverse party to be true.

   In such a case the defendant is not entitled to have the witness present for examination before the jury.

   *Evidence that had a tendency to contradict facts admitted* by the commonwealth to be true should have been rejected, or the jury told not to consider it.

3. *A sick witness* testified that she was sick and unable to be examined as a witness that day. The court directed the examination to proceed, and said that if she showed herself unable to go on he would give time; whereupon counsel for the prisoner stated what he expected to prove by her, and declined to go on with the examination. *Held,* that if this was error the court has no power to reverse on that ground. The court further say, " We do not perceive any error on this point."

4. WHAT THE WITNESS WOULD HAVE PROVEN MUST APPEAR.

   *When a witness is not allowed to answer a question* asked in behalf of the prisoner, it must appear from the statement of his counsel, made to the court at the time, what was expected to be proved by the witness; otherwise the Court of Appeals can not say the prisoner has been prejudiced by the refusal of the court to allow the witness to answer.

5. *Proof that the prisoner had a pistol on his person* on the day of and previous to the homicide, and

   *Proof of threats made prior to the day of the killing,* were admissible, for the double purpose of proving malice and to identify the prisoner as the person who killed the deceased.

6. A WRONGFUL ACT DONE INTENTIONALLY AND WITHOUT JUST CAUSE DENOTES MALICE—*i. e.,* furnishes evidence of malice.

"Malice in the legal sense denotes a wrongful act done intentionally, without just cause, and is implied by law from any deliberate, cruel act committed by one person against another, however suddenly done." This instruction, substantially taken from those approved in Kriel v. Commonwealth (5 Bush, 362), although inaccurate in language, was not prejudicial to the defendant.

"*By the term 'aforethought'* is meant a predetermination to kill, however sudden or recently formed in the mind before the killing.

7. MALICE AND MURDER.—*Malice* is a malignant passion, and may exhibit itself in wrongful acts; and when an act is cruel and is done deliberately, as such acts are generally the offspring of an evil mind, the law will imply the existence of the secret passion from proof of the outward sign of its presence.

*If the act be cruel—i. e., unnecessary and wanton—*it does not matter how recently the determination to do it may have been formed before it is done. It is the cruelty and the wantonness of the act, the animus of the actor, and not the length of time that a purpose to do the act may have existed, which determines its quality; hence it is proper to say that an unlawful homicide committed deliberately—*i. e.,* intentionally and maliciously—is murder.

8. ABSTRACT PROPOSITIONS, INSTRUCTIONS ON.—In this case, after the argument to the jury had commenced, the court at the instance of the commonwealth instructed the jury "that the presumption of sanity is as universal as the presumption of innocence," and "before they could believe a man was not of sound memory and discretion it must be established by proof to their satisfaction." There was nothing in the evidence or any instruction asked by the prisoner to render such an instruction necessary; but the court say, "We are unable to see how it can have prejudiced his rights."

9. IT IS NOT EVERY ABSTRACT INSTRUCTION THAT WILL CONSTITUTE ERROR for which the judgment should be reversed.

It ought to appear, before such an instruction is made the sole ground of reversal, that it is at least probable that the prisoner may have been prejudiced by it.

10. DRUNKENNESS.—The rule laid down in Shannahan v. Commonwealth (8 Bush, 463) is approved and adhered to—to wit: "What we do adjudge is, that in a case like this the fact of drunkenness, while it may be a circumstance showing the absence of malice, should not be singled out from the other proof, and the jury told that it mitigates the offense." An instruction set out in the opinion in conflict with this rule was properly refused by the circuit court.

*The instructions given in this case* properly left the jury to consider the fact of drunkenness in connection with all the other evidence in the cause, in deciding whether the killing was malicious, and gave

the prisoner all the benefit he was entitled to from the evidence touching his intoxication.

11. HEAT OF PASSION, without regard to the circumstances producing it, will not reduce a homicide from murder to manslaughter.

*Heat of passion*, in order to reduce a killing with a deadly weapon from murder to manslaughter, must have arisen from some provocation which, out of a tender regard for the weakness of human nature, the law deems sufficient to arouse passions which the party is for the moment unable to control, such as a blow, etc.

R. J. BRECKINRIDGE,  } . . . . . . For Appellant,
THOMPSON & THOMPSON, }

CITED

Criminal Code, secs. 189, 190.
Constitution of Ky., Bill of Rights, sec. 12.
Civil Code, sec. 345.      Wharton, sec. 932.
1 Starkie, part 3, sec. 15; *Ib.*, part 4, "Admissions."
9 Bush, 676, Bush v. Groom.
7 Bush, 320, Blimm v. Commonwealth.
8 Bush, 463, Shannahan v. Commonwealth.
7 Bush, 679, Donellan v. Commonwealth.

THOS. E. MOSS, Attorney General, . . . For Appellee,

CITED

Criminal Code, secs. 189, 190, 242, 243.
7 Bush, 320, Blimm v. Commonwealth.
2 Met. 2, Tyra v. Commonwealth.
2 Met. 30, Jane v. Commonwealth.
8 Bush, 464, Shannahan v. Commonwealth.

JUDGE COFER DELIVERED THE OPINION OF THE COURT.

Having been sentenced to be hanged for the murder of William Peach, the appellant has appealed to this court to obtain a reversal of that judgment.

The grounds relied on will be noticed in the order in which they are presented in the brief of the appellant's counsel.

1. The appellant filed an affidavit and moved to continue the prosecution on account of the absence of P. B. Thompson, jr., and Dr. T. T. Smith, alleged to be important witnesses for him.

VOL. XI.—38

He stated that he could prove by the former that just previous to the difficulty, and within three quarters of a mile of the place where it occurred, he saw the prisoner and the deceased together on their road home; that at said time there was no unfriendly feeling, or exhibition of unfriendly feeling, or any act of hostility or ill-will manifested by defendant toward the deceased, and that at that time he was in the act of getting up behind the deceased ·on deceased's horse for the purpose of riding home.

He also stated that Smith was a physician, and had made an examination of the wound on the person of the deceased, and would prove that the ball struck in the cheek and ranged downward, and that this evidence would be important in connection with other evidence in the case.

The attorney for the commonwealth resisted the motion for a continuance, and offered to admit that the statements of the affidavit as to what those witnesses would prove were true, and thereupon the court overruled the motion for a continuance.

Counsel concede that this court has no power to reverse the judgment for ·error in overruling the motion for a continuance, but they insist that the prisoner had a right to.the presence of his witnesses before the jury, and that the court, by compelling him· to try without them, is to be taken as having refused to admit important evidence in his favor.

We do not feel authorized thus, ·by what seems to us to be a strained construction, to hold that the effect of the ruling of the court was to reject important evidence, so that we may thereby acquire jurisdiction in effect to reverse for error· in overruling a motion for a continuance, even if we could see that error had ·been committed. But if we could concur with counsel and take jurisdiction to look into the action. of the court on this point, we perceive no error.

As long as facts are disputed the presence of the witness relied ·upon to prove them is often important, because from his

appearance, his deportment, and his manner of testifying, and from having an opportunity to judge of his intelligence, the jury will be much better able to fix a proper estimate upon his testimony. But when the facts to which an absent witness will swear are admitted by the adverse party to be absolutely true, then the presence of the witness is wholly unnecessary. His testimony delivered *ore tenus* could not possibly do more than establish the absolute truth of his statements.

2. After the jury had been sworn and some progress made with the trial the prisoner filed a second affidavit and moved to discharge the jury and continue the case.

He stated that two of his witnesses who were present at the commencement of the trial were then absent, and were sick and unable to attend. The facts to which he said they would swear were material. The court decided to proceed with the trial, but announced that if the witnesses could not be obtained the motion to continue the case would be acted on when that fact was ascertained.

The witnesses were subsequently brought into court, and one of them testified, and the other, upon being brought in, said she had been sick in bed for a week and was unable to be examined as a witness on that day. The court directed the examination to proceed, and said that if she showed herself unable to go on he would give time, whereupon counsel for the prisoner said they could only prove by her the same facts which had been proven by the other witness named in the affidavit who had already been examined, and declined to go on with the examination.

If this were error we have no power to reverse on that ground. The witness was the step-daughter of the prisoner; the circuit judge saw her, and must have believed she was able to testify, or he would have suspended the trial until she was better, or have continued the cause. Counsel did not make an effort to go on with the examination, nor did they ask for

time, and we do not perceive that the court committed any error on this point.

3. A witness, who saw the prisoner on the morning and perhaps on the afternoon of the day on which the homicide was committed, stated that he was then drunk, and said he could give his reasons for thinking he was drunk if it was desired. The attorney for the commonwealth objected to his doing so, and the court sustained the objection, and the prisoner excepted.

It does not appear what reasons the witness would have assigned for his opinion, and we can not say that the prisoner was prejudiced by the ruling of the court. It could only be available here upon its being made to appear what reasons it was expected the witness would give, and then it would be necessary that it should further appear not only that the reasons on which the opinion was based were competent evidence, but it should also appear that the evidence was important. (Subsec. 1, sec. 334, Criminal Code.) While those who see a man may differ in their judgment as to whether he is drunk or not, this is a subject upon which it is competent for a witness to give his opinion to the jury without giving any fact upon which that opinion is based. The witness had, at the prisoner's instance, stated that he was drunk, and unless we knew from the statement of his counsel, made to the court at the time, what reasons it was expected the witness would give, we can not say he has been prejudiced.

4. The commonwealth was permitted, notwithstanding the objections of the prisoner's counsel, to prove that on the day of the homicide, and previous to the time when Thompson saw him on his road home, he had a pistol on his person, and was also allowed to prove threats against the deceased made prior to the day of the killing.

These facts were admissible for the double purpose of proving malice and to identify the prisoner as the person who killed

the deceased, unless, as counsel contend, they were inconsistent
with the facts which it was admitted P. B. Thompson would
prove.

The prisoner did not admit the killing.  He had not only
denied it by his plea, but had, by his words and acts appearing
.in the evidence, imputed it to some unknown person.  He was
with the deceased when he was shot, and the only persons who
saw the shooting done were the two sons of the deceased, the
eldest of whom was nineteen years of age..  The deceased hav-
ing been shot, evidence that the prisoner had a pistol on his
person on that day tended to support the evidence offered to
prove that he did the shooting by showing that he had on his
person a weapon capable of inflicting the wound, and evidence
that he had previously threatened the deceased was admissible
for the same purpose.  That he once entertained the purpose
to kill the deceased tended in some considerable degree, especi-
ally under the circumstances of this case, to prove that he did
the killing.  If, however, it also had a tendency to contradict
the facts admitted by the commonwealth to be true, the court
should either have rejected the evidence or have told the jury
that they should not consider it except in deciding whether the
prisoner did the killing.  The court gave no such direction,
and we are therefore to decide whether this evidence was in-
consistent with the facts admitted.

So much of the admission as relates to this point is in these
words : "That at said time there was no unfriendly feeling or
exhibition of unfriendly feeling or any act of hostility or ill-
will manifested by defendant to deceased."  We understand
this as meaning that there was then no unfriendly feeling or
act of hostility or ill-will exhibited, and not that the prisoner
did not then entertain ill-will or hostility toward the deceased.
This seems to be not only the literal meaning of the language,
but it is not to be supposed either that the prisoner meant to
swear, or the commonwealth to admit, that the witness would

prove that there was in fact no secret unfriendly feeling or
feeling of hostility to the deceased in the mind of the prisoner
at the time referred to. The witness could not have known,
and could not have proved, that the prisoner did not then enter-
tain malice toward the deceased; but he may have known that
when he saw them on the occasion referred to there was no
manifestation of any such feeling; and this is no doubt what
he intended to say he could prove, and is all the commonwealth
can be held to have admitted. Thus understood, there is no
inconsistency between the admission made and the evidence
admitted.

5. It is claimed that the court misinstructed and refused
properly to instruct the jury.

The first objection taken to the instructions given is to the
third, which reads as follows: "Malice, in the legal sense, de-
notes a wrongful act done intentionally without just cause, and
is implied by law from any deliberate cruel act committed by
one person against another, however suddenly done." This
instruction is copied from one given in Kriel's case (5 Bush,
365), and approved by this court. The language of the in-
struction was not discussed in Kriel's case; and while it ex-
presses the legal idea intended to be conveyed with accuracy,
its language is not strictly accurate. Malice can not denote an
act, but, on the contrary, an act may denote—*i. e.*, furnish evi-
dence of—malice. And so the court goes on to say that malice
is implied by the law from any deliberate cruel act. But the
first clause of the instruction, "Malice, in the legal sense, de-
notes a wrongful act done intentionally," although not accurate
in itself, was not prejudicial to the prisoner.

The residue of the instruction is in accordance with a long
recognized and, until recently, universally accepted rule of
the common law. Malice is a malignant passion and may
exhibit itself in wrongful acts, and when an act is cruel and is
done deliberately, as such acts are generally the offspring of an

evil mind, the law will imply the existence of the secret passion from proof of the outward sign of its presence.

It is urged by counsel that the instruction is wrong, because the jury were told that this legal implication exists, no matter how suddenly the act may have been done; that under such an instruction, when taken in connection with the court's definition of the term "aforethought," no room is left for a distinction between murder and manslaughter. The court defined "aforethought" as follows, also in the language of an instruction in Kriel's case: "By the term aforethought is meant a predetermination to kill, however sudden or recently formed in the mind before the killing."

In giving these instructions the court was defining the crime of murder, and in order to do so must of necessity exclude manslaughter from consideration. But when, at the instance of the prisoner, the court came to define manslaughter the jury were told that if he killed the deceased without malice —i. e., that the act was not deliberate and cruel, but in sudden heat and passion, and not in self-defense—he was only guilty of manslaughter. Killing in sudden heat and passion would not be a deliberate act, nor would it be cruel in the sense in which that word was used or in its ordinary signification. Whether an act is cruel or not does not depend upon the nature of the act, but upon the circumstances under which it is done and the motive prompting it. No one would think of calling the killing of another in self-defense, or under the influence of a frenzy of passion aroused by great provocation suddenly given, a cruel act.

When it is said that an act was cruel, we understand the speaker to refer to the circumstances attending it and the animus with which it was done, and not to the nature of the act itself or the consequences flowing from it.

If the act be cruel—i. e., unnecessary and wanton—it does not matter how recently the determination to do it may have

been formed before it is done. It is the cruelty and the wantonness of the act, the *animus* of the actor, and not the length of time that a purpose to do the act may have existed, which determines its quality. Hence it is proper to say that an unlawful homicide committed deliberately — *i. e.,* intentionally and maliciously—is murder.

After the argument to the jury had commenced, the court, at the instance of the commonwealth, instructed the jury " that the presumption of sanity is as universal as the presumption of innocence, and before they could believe a man was not of sound memory and discretion it must be established by proof to their satisfaction." There was nothing in the evidence or in any instruction asked by the prisoner to render such an instruction necessary; but we are unable to see how it can have prejudiced his rights.

It is not every abstract instruction that will constitute error for which the judgment should be reversed. It ought to appear, before such an instruction is made the sole ground of reversal, that it is at least probable that the prisoner may have been prejudiced by it.

6. A large number of instructions were asked by the prisoner's counsel which were refused by the court, only a few of which need be specially noticed.

The first of these instructions was to the effect that although the jury might believe beyond a reasonable doubt that the prisoner killed the deceased, yet if they believed that at the time of doing so he was laboring under the influence of intoxicating liquor to such an extent as to influence and pervert his passions and blind his reason, and that without provocation he was unconsciously precipitated into the commission of a crime which he had never meditated, and which he would never have committed when properly sober and self-possessed, they must acquit of murder; but might find him guilty of manslaughter, provided they further believed that his condition was not the

offspring of meditated crime, or known to him to be the parent of passion and delusion dangerous to others.

Counsel cite and rely upon the case of Blimm v. Commonwealth (7 Bush, 320) and Shannahan v. Same (8 Bush, 463) as authorizing and requiring the instruction asked by them to be given. Whatever may have been said in Blimm's case, the doctrine in the subsequent case of Shannahan can not be regarded as an authority supporting the view presented in the instruction under consideration. After fully discussing the modern doctrine on this subject, and contrasting it with the ancient rule of the common law, the court summed up the result as follows: "What we do adjudge is, that in a case like this the fact of drunkenness, while it may be a circumstance showing the absence of malice, should not be singled out from the other proof, and the jury told that it mitigates the offense."

This rule would have been infringed by the instruction in question. Evidence tending to prove that the prisoner was drunk was allowed to go to the jury, and then they were told in instruction number five, given by the court, that they had a right to take into consideration the facts and circumstances proven in the case in determining the existence or non-existence of malice.

This left the jury to consider the fact of drunkenness in connection with all the other evidence in the cause in deciding whether the killing was malicious, and gave the prisoner all the benefit he was entitled to from the evidence touching his intoxication.

The prisoner's counsel also asked the court to instruct the jury that voluntary manslaughter is the unlawful killing of another in a sudden quarrel or in heat and passion, and if they believed from the evidence that the prisoner did unlawfully, without malice, kill Wm. Peach in a sudden quarrel or in heat and passion, they must find him not guilty of murder.

This instruction does not correctly define the law of man-

slaughter. Neither a sudden quarrel or sudden heat and passion will necessarily reduce an unlawful homicide committed with a deadly weapon to manslaughter. A mere quarrel will never do so, for the law will not accept mere words, however opprobrious and insulting, as an excuse for blows or to mitigate a homicide.

Heat of passion, in order to reduce a killing with a deadly weapon from murder to manslaughter, must have arisen from some provocation which, out of a tender regard for the weakness of human nature, the law deems sufficient to arouse passions which the party is for the moment unable to control, such as a blow or other actual trespass to the person, and some other wrongs not necessary to recite. But we know of no case in which heat of passion, without regard to the cause producing it, has been held to reduce an unlawful killing with a deadly weapon from murder to manslaughter.

We have given the record and brief of counsel a patient and careful consideration, but have been unable to see that the appellant has not had a fair and impartial trial according to the law of the land, and the judgment must be affirmed.