JOHNSON, Plaintiff in error, vs. THE STATE, Defendant in error.

*May 11—June 21, 1906.*

*Criminal law: Homicide: Murder in second degree: Evidence:* Res gestæ: *Statements of defendant: Reputation for truth and veracity: Manslaughter: "Involuntary killing:" "Heat of passion:" Instructions to jury.*

1. Evidence tending to show, among other things, that after an altercation with the deceased in a saloon, during which the lie was passed, defendant left the room in anger and quickly returned with a revolver, with which during a struggle with the deceased, who was trying to prevent him from using it, he shot the deceased three times, is *held* sufficient to sustain a conviction of murder in the second degree under sec. 4339, Stats. 1898, involving a finding that the act was one "evincing a depraved mind, regardless of human life."

2. The decision of the trial court as to whether matter is admissible in evidence as a part of the *res gestæ* is to be treated as correct unless manifestly wrong.

3. To be admissible as part of the *res gestæ,* a statement of the accused must have been an undesigned incident of the act in question, so near to and so connected with that act as to indicate its character.

4. After shooting a man during a struggle in a saloon, defendant telephoned for a doctor and thereafter remained for a time in the saloon. He then went to his room in the same building, and in a few moments left the building to go to the police station to give himself up. After walking about a third of a mile he boarded a street car, told where he wished to go, and made statements to the motorman as to what had occurred. *Held,* that the trial court properly excluded such statements as not being part of the *res gestæ.*

5. Evidence that defendant in a criminal case was reputed to be a man of truth and veracity was properly excluded, where no attack had been made upon his reputation in that regard.

6. The wilful shooting of a person with fatal effect, though done in the heat of passion and without design to effect death, cannot be deemed an "involuntary killing" within the meaning of sec. 4362, Stats. 1898, defining manslaughter in the fourth degree. The term *involuntary* signifies inadvertence. *Schlect v. State,* 75 Wis. 486, criticised.

7. The term "heat of passion," as used in the statutes relating to criminal homicide, means such mental disturbance, caused by reasonable, adequate provocation, as would ordinarily so overcome and dominate, or suspend the exercise of, the judgment of an ordinary man as to render his mind for the time being deaf to the voice of reason, make him incapable of forming and executing that distinct intent to kill which is essential to murder in the first degree, and cause him, uncontrollably, to act from the impelling force of the disturbing cause, rather than from any real wickedness of heart or cruelty or recklessness of disposition. It is not inconsistent with intelligent action, with consciousness of what one is doing and of the responsibilities therefor. An instruction that heat of passion means "such passion as amounts to a temporary dethronement of the reason and rendering the slayer incapable of forming a deliberate, premeditated design to kill," etc., was therefore erroneous. *Hempton v. State*, 111 Wis. 127, explained.

Error to review a judgment of the municipal court of Milwaukee county: A. C. Brazee, Judge. *Reversed.*

The accused, *John S. Johnson*, was charged with the highest degree of criminal homicide. He was in due form found guilty by the jury of the crime of murder in the second degree, and was thereupon sentenced to be punished by confinement at hard labor in the state prison at Waupun, Wisconsin, for the period of fourteen years, suitable provision according to law being made for solitary confinement. He was committed accordingly and was at the time of suing out the writ, and still is, serving his time. The facts of the case and the points suggested for consideration upon the review will be reserved for the opinion.

For the plaintiff in error there was a brief by *W. E. & F. P. Burke* and *John M. Clarke,* and oral argument by *W. E. Burke.*

For the defendant in error there was a brief by the *Attorney General* and *A. C. Titus,* assistant attorney general, and oral argument by *Mr. Titus.*

Marshall, J. On the 10th day of August, 1904, the accused resided at a boarding house in the city of Milwaukee

in which there was a saloon. He owned a revolver to the knowledge of the keeper of the house. He procured it some time prior to his residence in Milwaukee and while he was temporarily staying in Chicago, and carried the same in the latter place by permission of the police because, as he claimed, he had been threatened with and feared personal violence by members of a labor organization who conceived his business methods to be antagonistic to their interests. His residence in Milwaukee was of a temporary character and for the purpose of introducing there a patented device of which he was the inventor. He had been there about one month when the event causing his conviction occurred. About 10 o'clock on the evening of August 10th aforesaid he and others were in the saloon part of the boarding house engaged in the pastime of drinking, deciding in advance by shaking dice who should pay the bills. He was substantially a stranger to his associates. He claimed later that he supposed they were members of the class by whom he had been threatened in Chicago. After several rounds of shaking dice and drinking, Patrick Doyle and the accused being contestants on several of the occasions, they shook again and got into an altercation as to the result, ending with passing the lie between them and the accused leaving the room hurriedly and in anger. There was evidence tending to prove this. When the accused so left the room he used expressions indicating a purpose to return better prepared for attack or defense and to vindicate his position by force. He was heard to go rapidly through the dining room, into the hall leading to the stairs, along such hall to and up the stairs, then down the upper hall to his room, and to immediately retrace his steps to the saloon. During the short time of his absence one of the saloon attendants who knew of his having the revolver requested Doyle to leave the place so as to avoid the threatened trouble, which he declined to do. As the accused re-entered the saloon room Doyle started towards him with his left hand raised in an attitude and man-

ner suggesting intention to explain. *Johnson* immediately reached for his revolver, which was in his pocket. Seeing the movement and the weapon drawn and raised Doyle moved quickly forward toward *Johnson,* endeavoring to lay hold of him so as to prevent his using the weapon. Shooting immediately commenced. Several shots were fired within a short interval of time during which, except possibly at the instant of the first shot, the parties had hold of each other and were down or partially down on the floor. At last two shots were fired in rapid succession, when Doyle made some expression indicating a wish to cease the struggle, when the two separated. In a few moments Doyle was dead. As soon as the separation occurred a call for a doctor for the wounded man was suggested, and thereupon the accused volunteered to do that, which he did, being under such excitement that it was with some difficulty he made himself understood by the one called. Shortly after such calling, the accused went to his room. A few moments thereafter he left the place by the side door, for the purpose of going to the police station and giving himself up. He walked the distance of some five blocks and then boarded a street car. Soon thereafter he made statements to the motorman as to what had occurred and the circumstances thereof and said that he wanted to ride to the police station. He claimed on the trial that he procured his revolver merely to protect himself from supposed impending danger; that his purpose in returning to the saloon room was to treat the crowd and settle the existing difficulty that way; that before there was opportunity for him to carry out such purpose he was attacked by Doyle; that he fired the first shot through the window, being careful to see that no one was in the path of the bullet, and for the purpose of scaring Doyle; that the latter as he rushed toward the accused attempted to strike him with a beer bottle; that the deceased choked the accused, grasping him from behind, at the same time endeavoring to get hold of the revolver and turn it against the body of

the accused and discharge it; that the latter succeeded in working the weapon up over his shoulder and toward Doyle and then fired; that Doyle continued to choke the accused so he could not speak, in the meantime getting upon his shoulders, the accused being upon his knees, when he fired two shots backward; that Doyle then signified enough and the separation occurred; that the reason the accused armed himself and used his weapon was that he believed his life was in danger. There was evidence tending, strongly, to indicate that he had no reasonable ground to fear Doyle; that he was the real aggressor; that Doyle was wholly unarmed; that he did not strike the accused with a beer bottle or attempt to do so or to strike him in any other manner; that all he did was to make unsuccessful efforts to prevent the accused from successfully using the weapon.

The foregoing sufficiently indicates the circumstances of this case as the jury had the right to view them. We have not attempted to give the evidence in any considerable detail. It will suffice for the proper consideration of the questions presented to show, as we have, what the evidence tended to prove and that such tendency, notwithstanding evidence to the contrary, was sufficiently probative to justify the jury, reasonably, in believing beyond a reasonable doubt that such tendency pointed to the truth.

The first point made on behalf of plaintiff in error is that there was no evidence warranting a conviction of the accused of murder in the second degree. The idea advanced is that though the homicide was accomplished by an act imminently dangerous to others, it was not one evincing a depraved mind regardless of human life, and so did not satisfy all elements suggested by the language:

"Such killing, when perpetrated by any act imminently dangerous to others and evincing a depraved mind, regardless of human life, without any premeditated design to effect the death of the person killed or of any human being, shall be murder in the second degree." Sec. 4339, Stats. 1898.

There does not appear to be any merit in that contention. The mere passing of the lie under the circumstances of the case might well have been considered by the jury an inadequate provocation for such passion as to satisfy any of the degrees of manslaughter required to be characterized by heat of passion. They may well have considered that for a person to angrily dispute over such a trifling matter as who should pay a paltry sum for the drinks, his adversary apparently not being much, if any, his superior in strength and ability to defend himself by ordinary means, and upon being called a liar to rush off to his room, return armed with a revolver, bent on using it to secure an apology or revenge, to draw it, and, while his adversary was merely trying to prevent it from being successfully used, to discharge it four times, sending three bullets into the body of his victim with fatal effect, very clearly evinced a depraved mind, regardless of human life. The jury, having found the accused guilty of an offense higher than manslaughter, must have viewed the evidence quite charitably in finding a verdict of murder in the second degree instead of murder in the first degree. They were, it seems, well warranted in believing that the shots that took effect were fired during the struggle when the two men were down, or substantially so, on the floor; that though the weapon was, when discharged, pointed at a vital part of Doyle's body, the position of the accused was such that he may not have been conscious of that precise fact and may have fired thinking thereby more of disabling Doyle, yet regardless of consequences, than of taking human life. In other words, that he had no specifically formed design to take such life, but worked the weapon as he did moved by a depraved mind, regardless of human life, within the meaning of the statute. The case seems to present more clearly the essentials of murder in the second degree than did *Odette v. State,* 90 Wis. 258, 62 N. W. 1054, or *Flynn v. State,* 97 Wis. 44, 72 N. W. 373. As said in effect in the latter case, the evidence was open, reasonably,

to the view that the act of the accused was that of an angry man, without adequate provocation to suggest, reasonably, manslaughter in the third degree, evincing a depraved mind, regardless of human life, without the formed design to take human life essential to murder in the first degree.

Error is assigned because testimony was rejected as regards what the accused said about the circumstances of the homicide, when he was on the street car, journeying to the police station to surrender himself into the custody of the law. If the story told to the motorman was so near to and connected with the transaction to which it referred as to really characterize it, then it was within the field of *res gestæ,* and the evidence in relation thereto should have been admitted. What does and what does not form part of the *res gestæ,* as regards any particular occurrence, is often not clearly ascertainable. The principle governing the matter has definite boundaries, but whether any particular circumstance falls within such boundaries, upon the matter in regard thereto being presented to a trial court, is a question of competency, the decision of which is to be treated on appeal as a verity unless manifestly wrong. *Emery v. State,* 101 Wis. 627, 648, 78 N. W. 145; *Hupfer v. Nat. Dist. Co.* 119 Wis. 417, 96 N. W. 809; *Kavanaugh v. Wausau,* 120 Wis. 611, 98 N. W. 550.

Since a minor circumstance cannot be properly said to be a part of the *res gestæ* as to the major matter, unless it is so connected with the latter as to speak for itself, as it is said, indicating the character of the main fact, such minor circumstance, in order to fall within the field of *res gestæ,* must necessarily be undesigned, and so must have an unbroken causal relation to the main subject of inquiry. At the point where that causal relation is so interrupted by time or other circumstances that what lies further on no longer appreciably illustrates the character of the main fact, is the boundary line between what is and what is not *res gestæ.* There is no controlling rule as to the length of time between the happening of the

main fact and that of the minor incident claimed to character-
ize the former, by means of which the validity of the claim in
.that regard can even be established *prima facie*. The time
which is sufficient to break the chain under some circum-
·stances would not be under others. Under some the time
might be very brief and under others it might be considerable.
When the claimed evidentiary circumstance is so far disasso-
·ciated with the main fact as not to be appreciably considered
an incident of it, it is mere hearsay, not *res gestæ*.

In this case the accused did not leave the scene of the homi-
·cide until some time after it occurred. He took time to sum-
mon the doctor. While so doing he was admonished into some
·fair degree of coolness and quietude by the doctor, who was
unable, at first, by reason of the excited state the accused was
in, to understand what was wanted. Thereafter the accused
remained in the saloon room for a time considering whether
·to, as he said, wait until the deceased's pockets were examined.
Then he went to his room sufficiently composed to form, which
·he did, a deliberate purpose to forestall being arrested on a
·warrant, by going to the police station and surrendering him-
self to the authorities. He then put on his hat, passed down
the hallway to and down the stairs, and out the side door of
the building into the street. He then walked down the street
·somewhere about one third of a mile toward his destination,
when an opportunity presented itself for him to continue his
journey on a car. He concluded to improve it. After board-
ing the car he told the motorman where he wanted to go and
related that which it was sought to prove as *res gestæ*.

This relation of the matter shows, it seems, without further
comment, that the occurrence on the car was too remote from
the homicide to be so clearly an incident of it as to preclude
the trial court from holding that it was outside the boundaries
of *res gestæ*. ˙ There had been too much time for reflection,
too much time to calculate .upon the consequences, and too
much opportunity and motive for making up a story with ref-

erence to the future, to warrant holding that the statement on the car was an undesigned incident of the main fact, the homicide.

Evidence was offered to prove that the accused was reputed, in his home country, to be a man of truth and veracity, and the evidence was rejected. While the ruling on that matter is presented for review, counsel for the accused was too candid with the court to press it with any considerable degree of confidence. It was conceded, as of course the fact is, that it is quite elementary that a witness is not to be supported by proof of his having a good reputation for truth and veracity, till his reputation in that regard shall have been directly attacked. 2 Wigmore, Evidence, § 1104; 1 Jones, Evidence, § 156. That rule is the logical result of the other one that the law presumes every person to be reputed truthful till evidence shall have been produced to the contrary, and therefore, for one to take the initiative in establishing that which so needs no support, other than the legal presumption, is useless.

The court refused a request to submit to the jury the question of whether, on the evidence, the accused was guilty of manslaughter in the fourth degree. That is defined by sec.. 4362, Stats. 1898, thus:

"The involuntary killing of another by any weapon or by any means, neither cruel nor unusual, in the heat of passion,. in any cases other than such as are herein declared to be justifiable or excusable homicides, shall be deemed manslaughter in the fourth degree."

The idea suggested by counsel is that if there was no design to effect the death of Doyle and there was evidence of heat of passion, as the trial court held there was by instructing the jury on the subject of murder in the third degree, and the homicide was caused by a weapon of some sort, though without the use of any cruel or unusual means, the offense is within such statutory definition. That proceeds upon the theory that an involuntary killing is synonymous with killing with-

out design to effect death as that term is used in the statutory definition of several statutory homicidal offenses.   Probably counsel was justified in that view by what was said in *Schlect v. State,* 75 Wis. 486, 44 N. W. 509.

The circumstances in the case referred to were that when the accused and the deceased were clinched and in an angry struggle, the former drew a revolver and, holding it close to the body of the latter and pointing it at a vital part thereof, but without opportunity for deliberation, discharged it with fatal effect.   A conviction of manslaughter in the fourth degree was sustained, grounded, without good warrant, it seems, on *People v. Crowe,* 2 Edm. Sel. Cas. 152, and *Keenan v. State,* 8 Wis. 132.   In *People v. Crowe, supra,* there is a report of a case tried in the city court of New York presided over by Edmonds, J., who reported the case, with two aldermen.   Such report consists merely of a statement of the general features of the case, the judge's charge, and the verdict. The facts in brief were these: The deceased had been unjustifiably interfering for some time with the accused and his property, and had been on one occasion successfully prosecuted, criminally, therefor.   He had subsequently threatened to visit the home of the accused and obtain satisfaction for his supposed wrongs.   He armed himself with a club for that purpose to the knowledge of the accused.   On the day of the homicide the latter, believing an attempt to inflict personal violence on him to be impending, and on advice of the chief of police that he had a right to defend himself with firearms if he believed his life to be in danger, obtained a gun with which to make such defense.   Late in the evening thereafter the deceased visited the home of the accused, armed with his club, and made a vigorous assault therewith on the door, there being a number of people standing by.   The accused immediately responded by opening the door and stepping outside the house armed with his loaded gun.   As he did so, he notified the bystanders to clear the way as he was going "to shoot the

fellow." The deceased retreated and the accused pursued. As the former, still retreating, stumbled in trying to enter a nearby house to escape his pursuer, the latter drew on him and fired, killing him instantly.

The judge instructed the jury that if the offense was not murder, and was not manslaughter in the third degree because not characterized by heat of passion impelling the deed and the use of a dangerous weapon, the accused was guilty of manslaughter in the fourth degree. That was merely the opinion of the judge of an inferior court, and very clearly, we should say, not safe to be followed.

The statutory offense of manslaughter in the fourth degree was, when the trial above referred to occurred, the same in New York as here. The same is likewise true as to manslaughter in the third degree. The distinguishing characteristic of the former is the element of involuntary killing. Heat of passion is common to both offenses, and while the use of a dangerous weapon is essential in the third degree it may also characterize the fourth. So the test given in *People v. Crowe, supra,* in view of the facts to which it was there applied, should not have found favor here. The idea that one armed with a loaded gun, proclaiming to another and bystanders a purpose to shoot such other, may pursue him, he retreating, and, upon a favorable opportunity presenting itself, draw on such other and shoot him to death, and the offense be in any reasonable view of the matter called involuntary homicide, manifestly cannot be. The judge in the New York case simply did not take note of the significance of the term *involuntary* in the definition of the offense of manslaughter in the fourth degree.

As to *Keenan v. State,* 8 Wis. 132, of which this court was made to say in *Schlect v. State,* 75 Wis. 486, 44 N. W. 509, the defendant was convicted of manslaughter in the fourth degree, and the facts were in many respects like those in the *Schlect Case,* the report shows that there was such similarity

of facts, but that Keenan was convicted of manslaughter in the first degree instead of manslaughter in the fourth. This court is made to say that the ruling of the circuit court that the Keenan offense came within the fourth degree of manslaughter, was approved here on review. That clearly was a mistake. No such question was presented in the *Keenan Case.* The court there dealt with manslaughter in the fourth degree only in this wise: The trial court was requested to instruct the jury that every involuntary killing of another by any weapon in the heat of passion which is not declared to be excusable homicide is manslaughter in the fourth degree. The request was rejected, because it was not so framed as to exclude the element of cruel or unusual means. The statutory language on the subject was given to the jury instead by the trial judge and the ruling was approved.

It must be observed, in order to avoid error in such cases as this, that manslaughter in the third degree is defined as the killing of a human being in the heat of passion without a design to effect death, etc., while manslaughter in the fourth degree is defined to be an involuntary killing of a human being in the heat of passion, etc. The term *involuntary* signifies inadvertence. It is inconsistent with the wilful shooting of another with fatal effect. One may so wilfully shoot, pointing a gun at such other and discharging it purposely, yet not aim the weapon at a vital part of the body in the sense of a mental and physical operation to that end—though the presumption without explanation would be to the contrary—and so without necessarily a specific design to effect death. But such an act cannot be deemed involuntary within the meaning of our statute. It is said elsewhere that when one voluntarily shoots another fatally, the homicide cannot be deemed involuntary. *Smith v. State,* 73 Ga. 79; *State v. Cantieny,* 34 Minn. 1, 7, 24 N. W. 458. It follows that the court very properly refused to instruct the jury to consider the subject of manslaughter in the fourth degree.

The next and last assignment of error which seems to merit attention relates to the trial court's exposition of the term *heat of passion*. It is claimed by counsel for the accused that the instruction was well calculated to give the jury an idea that, to satisfy the statute on that subject, the mental disturbance must be so great as to pass the boundary of intelligent action. Since there was evidence from which the jury might have found that the deceased was the attacking party, and that before and during the shooting he was abusing the accused in a highly exasperating manner, if the degree of mental disturbance necessary to reduce what would otherwise be a homicidal offense higher than that of manslaughter in the third degree to such degree was exaggerated by the trial court, the result may have been highly prejudicial to the accused. It may have resulted in his conviction of murder in the second degree punishable by confinement in the state prison from fourteen to twenty-five years (sec. 4344, Stats. 1898), when the conviction would otherwise have been of the offense of manslaughter in the third degree punishable by such confinement of from two to four years (sec. 4361, Stats. 1898).

The essentials of heat of passion, as the term is used in defining homicidal offenses, are not given in the authorities with that entire harmony which one would like to see respecting so important a matter. All, however, agree that the mental disturbance must be produced by such provocation as, reasonably, would ordinarily have that effect in case of an ordinary man, and actually had such effect in the given case. That is what is meant by the term *adequate provocation*. *Ryan v. State,* 115 Wis. 488, 92 N. W. 271; *Davis v. People,* 114 Ill. 86, 29 N. E. 192; *State v. Shippey,* 10 Minn. 223; *State v. Hoyt,* 13 Minn. 132; *Reg. v. Welsh,* 11 Cox C. C. 336; *State v. Grugin,* 147 Mo. 39, 47 S. W. 1058; *People v. Calton,* 5 Utah, 451, 459, 16 Pac. 902; *Brooks v. Comm.* 61 Pa. St. 352; 1 McClain, Crim. Law, §§ 337, 338. In 21 Am. &

Eng. Ency. of Law (2d ed.) 177, the rule on this subject supported by many authorities cited is phrased thus:

"The provocation, in order to be sufficient in law, must be such as, naturally and instantly, to produce in the minds of persons, ordinarily constituted, the highest degree of exasperation, rage, anger, sudden resentment, or terror."

The trial court for some reason failed to give any explanation of this feature of the case in the instructions.

The degree of mental disturbance essential to heat of passion will be found variously stated in the authorities. Here and there it is stated thus mildly:

"Reason should, at the time of the act, be disturbed or obscured by passion to an extent that might render ordinary men, of fair average disposition, liable to act rashly or without due deliberation or reflection, and from passion, rather than judgment." *Maher v. People,* 10 Mich. 212; *People v. Lilley,* 43 Mich. 521, 5 N. W. 982.

That has been referred to here, on at least one occasion, in a manner to suggest approval. *Perugi v. State,* 104 Wis. 230, 240, 80 N. W. 593. Generally language is used in the authorities calculated to suggest a still greater degree of disturbance, as for examples:

"Provocation . . . such as might naturally kindle ungovernable passion in the mind of an ordinary and reasonable man." *Reg. v. Welsh,* 11 Cox C. C. 336. "Heat of passion apparently sufficient to make the passion irresistible." *Davis v. People,* 114 Ill. 86, 29 N. E. 192. "Provocation . . . sufficient to excite an irresistible passion in a reasonable person, one of ordinary self-control." *People v. Hurtado,* 63 Cal. 288, 292. "Passion which for the moment the party is unable to control." *Nichols v. Comm.* 11 Bush, 575. "Passion producing the highest degree of exasperation." *Preston v. State,* 25 Miss. 383. Provocation engendering passion depriving the actor for the time being "of the power of self-control." Stephen, Dig. Crim. Law (6th ed.) art. 246. "Passion

suspending the exercise of judgment and dominating volition so as to exclude premeditation and a previous formed design." *Smith v. State,* 83 Ala. 26, 3 South. 547.    "Sudden impulse of overmastering passion."    *McDuffie v. State,* 90 Ga. 786,. 17 S. E. 105.    To the same effect are 2 Bish. New Crim. Law, § 697; Desty, Am. Crim. Law, § 128*d; State v. Davis,* 50 S. C. 405, 422, 27 S. E. 905; *Brooks v. Comm., supra; People v. Calton, supra.*

The more emphatic manner thus indicated of stating the matter has found most favor here, as is indicated by *Hempton v. State,* 111 Wis. 127, 142, 86 N. W. 596; *Ryan v. State,* 115 Wis. 488, 92 N. W. 271.    We are constrained to approve the idea that the heat of passion which will reduce what would otherwise be murder to manslaughter in the third degree, and which is specified inclusively or exclusively in the statutory definitions of other homicidal offenses, is such mental disturbance, caused by a reasonable, adequate provocation as would ordinarily so overcome and dominate or suspend the exercise of the judgment of an ordinary man as to render his mind for the time being deaf to the voice of reason: make him incapable of forming and executing that distinct intent to take human life essential to murder in the first degree, and to cause him, uncontrollably, to act from the impelling force of the disturbing cause, rather than from any real wickedness of heart or cruelty or recklessness of disposition.    Uncontrollable passion in such circumstances is supposed to "sway the reason regardless of her admonitions," but it is not presumed to be, nor does the heat of passion spoken of contemplate, such overpowering disturbance as to destroy volition, the reasoning faculty, even temporarily.    It is said that a transport of passion which deprives one of the power of self-control is, in a modified or restricted sense, a dethronement of the reasoning faculty, a divestment of its sovereign power, but an entire dethronement is a deprivation of the intellect for the time being. *Smith v. State, supra.*

It was in the modified or restricted sense above indicated that the term *dethronement* was used in *Hempton v. State,* 111 Wis. 127, 143, 86 N. W. 596, as is clearly indicated by the context.   It was said in that case:

"Now, if from passion . . . a person, for the moment, is unable to exercise his reason, and while he is in such condition, though conscious of what he is doing and not so completely bereft of reason as to be legally irresponsible, he is uncontrollably moved thereby to and does wrongfully kill another, he cannot be convicted of murder in the first degree. . . . If reason, notwithstanding the . . . disturbing cause, *be not so completely dethroned, so to speak,* but that the wrongdoer can exercise judgment, he must do so or pay the penalty of being held responsible for his acts regardless of such disturbing cause."

The disturbing cause in the particular case was intoxication, but it was said that the rule was the same as in case of uncontrollable condition through anger, terror, or any other adequate cause.

It is believed that the exposition thus given is strictly accurate, though it is now regretted that the term *dethronement* was used at all.   While it was considerately and designedly guarded so as to avoid conveying the impression of more than temporary control or displacement of judgment, not a deprivation of reason, strictly so called, it seems—as perhaps ought to have been appreciated—that the clear distinction and the evident effort to make it significantly plain is not wholly appreciated.

In *Smith v. State,* 83 Ala. 26, 3 South. 547, the trial court used the term, "this heat of blood must be such as to entirely dethrone reason, and the assault be made in consequence of" such heat of blood.   And the conviction was set aside on that ground.

In *State v. Hill,* 4 Dev. & Bat. Law, 491, 496, the jury were instructed, in effect, that if reason was not so destroyed but that the accused was possessed of sufficient power of de-

liberation and reflection to be sensible of what he was about to do, and did the act intentionally, he was guilty of murder. The conviction was set aside because the instruction tended to mislead the jury into believing that the passion which rebuts the imputation of murder from the unlawful killing "must be so overpowering as, for the time, to shut out knowledge and destroy volition." That case is found most universally cited in support of condemnations of the use of the term *dethronement of reason* in defining heat of passion. In *Young v. State,* 11 Humph. 200, the instruction treating of manslaughter was in these words: "If the jury should believe that the deceased was advancing upon the prisoner with a stick, threatening to beat him, and such assault excited in the prisoner a sudden burst of passion, and, for the time being, dethroned his reason, and he shot and killed in this whirlwind of passion, it would be manslaughter." And the conviction was set aside on that ground. To the same effect are *Maher v. People,* 10 Mich. 212, 220; *Haile v. State,* 1 Swan, 248; *State v. Davis,* 50 S. C. 405, 27 S. E. 905; *People v. Calton,* 5 Utah, 451, 16 Pac. 902; Clark, Crim. Law, 167; 2 Bish. New Crim. Law, § 697; 21 Am. & Eng. Ency. of Law (2d ed.) 174.

From the foregoing it will be seen that the heat of passion of the statute on the subject of criminal homicide, while it involves deprivation of self-control by exercise of judgment: passion irresistible, or, in other words, a disturbed mental condition, caused by passion, incapacitating the person from forming and executing a distinct intent to take human life, is not inconsistent with intelligent action, with consciousness of what one is doing and of the responsibilities therefor; it is not such as to, temporarily even, dethrone reason, strictly speaking: destroy volition.

It may be that a jury would not, ordinarily, fully appreciate the distinction between temporary dethronement of reason and such temporary domination of judgment by an irresistible impulse of passion as to render the mind deaf, so to speak, to

the voice of reason, but the distinction is clear in the law, and, in dealing with matters of such supreme importance as human liberty on the one side and the safety of society on the other, it will not do to overlook it or to pass it by as nonprejudicial in case of the distinction being lost sight of in instructing the jury in such a case as this. A guilty man had better go free or be convicted of something less than his deserts, as a choice between such freedom or conviction on the one hand and a conviction of what he is really guilty of on the other, unless the latter can be regularly reached by way of the due administration of the law of the land.

In the light of the foregoing little more need be said to show that the judgment complained of must be reversed than to quote the only instruction which the court gave on the subject of manslaughter in the third degree, except to recite the statutory definition. This is the instruction:

"Heat of passion as used in this section means something more than mere anger or irritation. It means passion: such passion as amounts to a temporary dethronement of reason, and rendering the slayer incapable of forming a deliberate, premeditated design to kill; passion engendered by provocation; provocation to that degree that the heat of passion thereby engendered was so great as to amount to temporary dethronement of reason and rendering the slayer incapable of forming the deliberate, premeditated design to kill. If he is capable of forming and does form and execute such design or intent unlawfully, it is murder in the first degree although he may have received some provocation and acted under some passion."

We do not fail to note what the learned attorney general called to our attention, regarding the term *dethronement of reason* being immediately followed in the conjunctive by the idea of incapacity to form a distinct intent to kill. Such idea, as phrased and expressed, was not used as it might have been in the way of an explanatory or modifying clause. Had it been so used, possibly the case might be saved. It were better, however, had it not been used at all. The learned court in-

stead of saying temporary dethronement of reason, *to the extent of or in the sense of rendering the slayer incapable,* etc., *ex industria* used that which might easily have been made, as indicated, a modifying clause, in such a way that the jury may well have regarded it rather as the ordinary consequence to be expected from dethronement of reason strictly so called. The error was intensified, it seems, by omission to explain the nature of the provocation essential to the heat of passion of the statute, and the repetitious use of the term *deliberate, premeditated design,* a term not found in our statute on the subject of homicide: one suggesting, necessarily, some period of time for deliberation and thought, as sometimes held to be necessary under statutes containing such terms as deliberate, premeditated, or wilful, deliberate, premeditated. *Cupps v. State,* 120 Wis. 504, 532, 97 N. W. 210, 98 N. W. 546. Our statute only uses the term *premeditated design* and does that as synonymous with previously formed design, not suggesting any necessary element of lying in wait, or a period of deliberating on the execution of the intent.

*By the Court.*—The judgment is reversed, and the cause is remanded for a new trial. The warden of the state prison will surrender the plaintiff in error to the sheriff of Milwaukee county. He will hold him in custody until he shall be discharged or his custody changed by due course of law.