## ISAAC P. DAVIS

*v.*

## THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Ottawa May 15, 1885.*

1. CRIMINAL LAW—*in case of homicide—proof of character of deceased as a peaceable man, and the contrary.* Where a defendant on trial for the murder of his brother proved that the deceased was regarded as a "good man in a fight," and many other things that tended to show his character as a quick-tempered, violent and rash man, it was *held,* that there was no error in allowing the prosecution, in rebuttal, to prove the character of the deceased as a peaceable man.

2. SAME—*treatment of deceased by defendant.* In the same case it was held that evidence of the manner in which the defendant had previously treated the deceased, being wholly immaterial, was properly excluded.

3. SAME—*defining the various grades of the offence—instructions.* On the trial of one for murder, where the evidence clearly showed the homicide was either murder or voluntary manslaughter, an instruction defining voluntary manslaughter need not also define involuntary manslaughter. To do so would be to call the attention of the jury to a principle of law not applicable to the facts, and would tend to confuse rather than enlighten them as to the real issue.

4. An instruction in such case, telling the jury that they must believe, from the evidence, that the killing "was done in sudden heat of passion apparently sufficient to make the passion irresistible," to make it manslaughter, is not subject to the objection that it requires the defendant to show the existence of a passion absolutely irresistible, to reduce the killing to manslaughter; and it is not faulty in failing to state the law of self-defence, when that is stated in other instructions.

5. SAME—*reasonable doubt.* The law does not require that the jury shall believe that every fact in a criminal case has been proved beyond a reasonable doubt, before they can find the accused guilty. The reasonable doubt the jury is permitted to entertain must be as to the guilt of the accused on the whole evidence, and not as to any particular fact in the case.

6. INSTRUCTIONS—*degree of accuracy required.* The correctness of instructions is to be tested by the evidence and facts in each particular case. They will be sufficient if they state the law with reasonable accuracy, in view of the evidence in the case. To require absolute technical accuracy in all cases, would be, under the administration of the criminal law, so difficult, as to make it almost impracticable to secure a conviction.

7. SAME—*assuming a fact not disputed.* Even if an instruction given on the trial of one for murder should assume the fact that the killing was shown by the evidence, where the fact of the killing is not a disputed fact, but is conceded, that would afford no ground of error.

WRIT OF ERROR to the Circuit Court of Warren county; the Hon. ARTHUR A. SMITH, Judge, presiding.

Messrs. MCKENZIE & CALKINS, and Messrs. GRIER & DRYDEN, for the plaintiff in error.

Mr. GEORGE HUNT, Attorney General, for the People.

Mr. JOHN W. MATTHEWS, State's Attorney, also for the People.

Mr. JUSTICE SCOTT delivered the opinion of the Court:

At the January term, 1884, of the Warren county circuit court, an indictment was presented, in open court, by the grand jury, charging Isaac P. Davis with the murder of James K. Davis. In the first count of the indictment it is charged the murder was committed with a "single-tree," in the second that it was done with a "false standard of a wagon," and in the third that it was done with a deadly weapon to the grand jury unknown. At a trial of the cause had at the September term, 1884, defendant was found guilty of manslaughter, in manner and form as charged in the indictment, and the jury, by the verdict, fixed the term of punishment defendant should suffer, at five years in the penitentiary. The motion made by defendant for a new trial was overruled, and the court pronounced judgment on the verdict. To reverse the judgment against him, defendant brings the case to this court, on error.

Much stress is laid on the point made the verdict is not warranted by the evidence, and therefore it was error in the court to overrule the motion made for a new trial. The earnestness with which this point in the case is pressed on

the attention of the court, has induced a most careful examination of all the evidence contained in the record. It is seen that much of it is irrelevant, and illustrates no phase of the case. The killing took place in the field, where defendant and his hired hand and two little sons were gathering corn. These were all the persons that witnessed the affray. Only a brief period elapsed from the time deceased came into the field until he was struck down with a single blow, that proved mortal. It would seem the details of the sad controversy between defendant and the deceased might be briefly told by the few persons present, and yet this record contains many hundred pages of testimony, closely written. Really what occurred in the field where the mortal combat took place was briefly told, for the facts were necessarily few, and could be readily stated, as was done by the witnesses. This immense volume of testimony consists mostly of contradictory statements of many of the witnesses, and of the details of matters occurring elsewhere. Voluminous as the record is, it has been patiently examined, with a view to see whether the verdict is warranted by the whole evidence, and the conclusion reached from such examination is, the verdict is fully sustained.

It would answer no good purpose to enter upon any close analysis of the entire testimony. Only those facts occurring in the field are important to be considered. It is proved deceased entered that field alone, and was carried home in an insensible state, from which he never recovered. No one in his interest was present to give his version of what took place. The history of what occurred comes alone from defendant, his two little sons, and the hired-man. Counsel concede, as the truth is, there is a conflict in the evidence, not only as to which of the brothers began the affray, but also as to its cessation and renewal. No two of the witnesses state what occurred, precisely alike. This is not a matter that militates against the truthfulness of their respective statements. The

events occurred rapidly, and were of the most exciting character. It is no wonder the persons that witnessed the affray may not have been able to describe all that took place, exactly alike. It would have been singular if they had done so. As to the principal fact that defendant struck the fatal blow that caused the death of deceased, there is no controversy. It is an admitted fact. But with what instrument,—whether a false standard from the wagon, or a single-tree,—deceased was struck, or whether deceased was pursuing defendant, or defendant was pursuing deceased, at the time the blow was struck, are all matters about which the evidence is conflicting. Controversy as to what instrument was used to inflict the wound arose at the inquest that was held over the body of the dead man. The manner in which the witness McManus (defendant's hired-man,) was examined, shows that in some way it had already become understood, or was suspected, the blow was given with a single-tree. This is evident from the fact the witness was examined concerning that matter, and he denied he had told any one defendant took the single-tree off the wagon, or that he told him to do it. How did it become so soon suspected the single-tree was used by defendant? Some one must have told or suggested it. Witnesses say defendant himself told it the night on which his brother's death occurred, but this defendant denies. It is clear the controversy as to the weapon used did arise at the time or before the inquest was held, and it is a most significant fact neither defendant nor McManus stated at the inquest what instrument was in fact used, nor did either of them say the single-tree was not used. Both defendant and McManus stated more in detail what occurred in the field, in their examination at the trial, than at the inquest, or else their testimony is more fully reported on the latter occasion. An effort was made to break the force of the testimony of McManus, as given on the trial, by a most severe cross-examination, and by proving many contradictory statements made by him out

of court concerning the case and as to what his testimony
would be.    It must be admitted the witness McManus made
many conflicting statements concerning the facts of the case,
some of them in regard to material matters, and others as to
matters wholly immaterial.    Some denunciation of this wit-
ness is indulged by counsel, and yet not one of his neighbors,
in the midst of whom he lives, is found to say his character
for truth and veracity is bad.    That his testimony on the
trial and at the inquest is different concerning some material
facts, may be admitted; and yet, when his statements as to
what did actually occur in the field are subjected to a close
scrutiny, it will be seen there is very little that is variant.    As
reported, his first examination was very meagre, and it may
be he omitted to state many things at the inquest that he
afterwards stated on the trial.    It is this omission to state all
that occurred that makes his testimony seem to be so very
different on his last examination.    On the trial the testimony
given by McManus at the coroner's inquest was introduced
in evidence by defendant himself, so the jury had an oppor-
tunity to see wherein it was variant, as to all material facts,
from that given on the trial.    The witness confesses, without
reserve, his statements at the inquest were not *all* the truth,—
that he suppressed much that was material.    At the time, he
was in the employ of defendant, and was induced, as he says,
by the earnest entreaties of defendant and his family, to sup-
press many material facts before the coroner's inquest, as he
did.    The reason assigned for his action in that respect is
not without something in its support that palliates it, but of
course not enough to justify it.    It was an hour of intense
excitement to all concerned, and defendant and his family
were overcome by the distress that had come upon them.    It
is by no means unnatural the witness should feel inclined to
favor defendant so far as he could, and in that way relieve
defendant from the shock of a great sorrow that had so re-
cently and so suddenly come upon him.

It will be seen that on the trial the witness McManus assumed to state all that occurred between the brothers in the field. According to his testimony, deceased had ceased the quarrel with defendant, and was standing still on ground he claimed to have in his rightful possession; that he warned defendant not to strike him; that he told him he was unarmed, and that while standing in that position defendant deliberately struck him a blow with a single-tree, that shortly produced death. This account of the manner of the killing was not given by the witness at the inquest, and for that reason it is said he is unworthy of belief. The force of the argument on this branch of the case may be admitted in a measure, but not to the extent insisted upon. It is quite certain the jury did not give full credence to the details of facts occurring in that fatal field as given by McManus on the trial, or else it is hardly probable this verdict would ever have been for manslaughter. As the facts are stated by McManus on the trial, the killing was deliberate, willful murder. But the jury no doubt took another view of the case,—that the killing was done in the midst of a heated quarrel between the brothers, and the crime was therefore manslaughter. This, indeed, is a most favorable view for defendant. Considering the testimony of McManus, both before the coroner and at the trial, and that given by defendant himself at the inquest, in connection with the facts and circumstances proven about which there is and can be no controversy, this verdict is not only warranted, but one imposing a much severer punishment might be sustained. It appears that when deceased came into the field a heated controversy at once arose between the brothers concerning the corn. Angry words passed, and according to the testimony of McManus before the coroner, the first overt act of violence was committed by defendant. It is said defendant pulled a false standard out of the wagon and raised it over the head of deceased, and told him to go home, and then deceased took after the accused, and run him

around the wagon. The witness was not positive that deceased had a knife in his hand,—saw something he thought was a knife, but was not positive it was not a husking-peg. The witness further says: . "They seemed to be dodging around wagons,—each dodging from the other. . Isaac was in front when they started. Do not know which was in front when they left the wagons." Again he says: "The fight lasted not more than ten minutes, and they ran after each other, trying to strike each other. Saw James (deceased) try to get the wrench out of the wagon, but he did not get it out entirely, as he dodged from there, and seemed in a hurry." Witness thought the deceased was to blame for starting the trouble, but admits he told Mrs. Davis "one was as much to blame as the other, as they were both in a passion." In his examination before the coroner, McManus does not state whether he saw the blow struck or not. The parties were some distance from the wagons, and when he was called he went to them, and found deceased on the ground, unable to speak. The testimony of defendant taken by the coroner was introduced in evidence by the prosecution. As it was given so soon after the occurrence, and when every fact must have been vividly present to his mind, it can certainly be relied on as not unfavorable, at least, to defendant. It was given at an hour and in a presence when no man could well dissemble. Even his own account of what transpired, standing alone, if there were no other evidence in the case, does not excuse his conduct, when considered in connection with facts and circumstances proven past all doubt. It is here defendant testifies he ran around the wagons "as much as twice, and then turned and ran down the corn—down the row—and he (deceased) after me, for about fifty yards; then I stopped, turned around, and struck him with something,—don't know what. He was advancing toward me when I struck him, and he fell." And then it is added: "Can't say I saw the knife, when I turned on him. Have not seen it since.

Have not been there since. Had club, or whatever it was, in my right hand. Know I grabbed for false stake in wagon, but don't know whether I got it or not." It is evident the account given by McManus and defendant, at the inquest, does not contain all that transpired on that fatal field. Something more occurred than what either of them disclosed on their first examinations. Whether all that McManus related on the final trial took place, it is obvious the history of the affray was imperfectly given at the inquest, or else what the witnesses stated is not preserved in the record. So far as they undertook to state the facts, both witnesses may have been candid, and yet they may have omitted much that was material. Neither witness ventured to state with what instrument the blow was inflicted. This is a most singular omission. Their testimony was taken in less than twenty-four hours after the affray, and it seems incredible the witnesses did not know what weapon was used. One or the other, or both, of these witnesses must have known. But a statement of defendant that challenges belief is, that he did not know with what instrument he struck the blow that killed his own brother. He knew and admitted he "grabbed for the false stake" in the wagon, but adds, "don't know whether I got it or not." This exact statement was repeated on the trial, and when asked, "What did you strike him with?" he answered, "I will never tell you." The reason assigned why he did not tell was, because, he said, he did not know. The witness McManus, on the trial, said the fatal blow was given with a "single-tree." The only denial defendant makes of this statement of McManus is, that he "don't know." It may have seemed incredible to the jury a man who had just slain his brother could not, or would not, tell how and with what it was done, and for that reason they may have concluded it was done, as McManus said it was, with a "single-tree." If so, it was one of the strong criminating circumstances in the case.

But there is another criminating fact, the force of which can not be avoided, that depends for its existence neither upon the testimony of defendant nor McManus, and concerning which all the evidence concurs. It is, that deceased was killed with a single blow, and that was on the back of the head, and whether the wound was inflicted with a "false stake" or a "single-tree," matters little. The theory of the defence insisted upon by the evidence of defendant, and in the argument of counsel, is, that defendant was so hotly pursued by deceased through the corn, from the wagons, where the affray began, that danger to life, or great bodily harm, became imminent, and he "turned and struck" him. Is this theory consistent with the fact deceased was struck but a single blow, and that on the back part of the head? No wounds appeared elsewhere on his person. Had it been true deceased was pursuing defendant, and was so close upon him as to place his life or limb in imminent peril, is it probable, or even possible, he could have turned and struck deceased on the back of the head, if he was advancing upon him as defendant says he was? As before stated, defendant says he held the instrument, whatever it was, with which the blow was struck, in his right hand, and McManus, in his testimony on the trial, says defendant passed around deceased to the left,—and that would enable him to give the blow precisely as all the surgeons located the wound that was inflicted. Indeed, it seems improbable it could have been inflicted otherwise. If it shall be assumed, according to the theory of the defence, that deceased was pursuing defendant, and was pressing hard upon him when he "turned and struck," in all probability the blow would have fallen on the front or side rather than on the back of the head. The instinct of self-preservation, in the immediate presence of imminent peril, would have caused deceased to throw up his arms, and in that way much of the force of the blow would in all probability have been received upon his arms, or at least upon the front part of the head. All the

reasonable probabilities support the testimony of McManus that defendant passed around to the left of deceased, and from that position it was practicable to inflict the blow, as was done, on the back of the head. Any other theory seems inconsistent with the location of the mortal wound. Assuming, then, as may be done consistently with the weight of the evidence, that defendant passed around to the left of deceased, and struck him with an instrument which he held in his right hand, the guilt of defendant is established beyond all cavil. It rebuts the idea deceased was pursuing defendant, and was pressing so close upon him as to place his life or limbs in imminent peril, when he turned and struck, and that being so, the conviction was warranted both by the law and the facts.

Coming now to consider other questions made on the record, the first point made is, the court erred in admitting evidence for the People, and refusing to permit proper evidence to go to the jury, for defendant. It seems defendant had proved deceased was regarded as a "good man in a fight," and many other things that tended to show his character as a quick-tempered, violent and rash man. After such evidence had been admitted, the prosecution was permitted to prove the character of deceased as a peaceable man, and this is the evidence that is complained of as being incompetent and hurtful. What defendant proved concerning deceased was equivalent to proving his general character as a violent and fighting man, and there was certainly no serious error, if there was any at all, in permitting the prosecution to rebut such evidence of character by proving, as was done, his general character as a quiet and peaceable man. Indeed, it is not perceived how else it could be so well disproved. At all events there was nothing in the evidence that could prejudice the defence defendant was endeavoring to make, and there is no just ground for complaint on that score.

There was clearly no error in the ruling of the court in excluding evidence of the manner in which defendant had

treated deceased. It was wholly immaterial whether defendant's conduct in the respect indicated afforded deceased any reasonable ground for complaint or not, and the court was clearly right in not permitting that matter to be investigated.

Another ground of reversal insisted upon is, the court improperly instructed the jury, on behalf of the People, and particular attention is called to instructions numbered, respectively, $4\frac{1}{2}$, 5, 7, 9 and 11, as manifestly misleading, erroneous, and prejudicial to defendant. On this branch of the case it might be sufficient to say the several instructions have been carefully considered, and it is not perceived they contain anything prejudicial to the defence sought to be made. It might be some of them, as now framed, would not be regarded as stating the law as fully and accurately as should be done if given in another case where the evidence was widely variant from what it is in the case being considered. In view of the evidence contained in this record, the instructions state the law applicable to the facts with sufficient accuracy, and that is all defendant has any right to insist upon. Many of the objections taken to the instructions are hypercritical, and if sustained in this and other cases, it would render the administration of the criminal law so difficult as to make it almost impracticable to secure a conviction of the wrongdoer, however clearly he may be proved to be guilty. Such strictness the law will not tolerate.

It is said instructions $4\frac{1}{2}$ and 5 do not fully inform the jury as to the law of manslaughter. One of these instructions contains a definition of manslaughter, voluntary and involuntary, in the precise language of section 43 of the Criminal Code, and although some objections are taken, it is apparent "voluntary manslaughter" is defined with sufficient accuracy. But the objection most strongly urged is, that neither by instruction $4\frac{1}{2}$ nor instruction 5 did the court make even any attempt to inform the jury as to what constitutes "involuntary manslaughter." It was not necessary to define the latter

crime.   The case made by the evidence was either murder or
voluntary manslaughter.   It contained not a single element,
other than the killing itself, of involuntary manslaughter, and
had the court specifically defined involuntary manslaughter,
it would have answered no good purpose.   It would have
directed the attention of the jury to a principle of law not
applicable to the facts of the case, and the result would have
been to confuse rather than to enlighten them on the issue
they were to try.   It is said, also, the fifth instruction requires
defendant to show the existence of a passion absolutely irre-
sistible, to reduce the killing from murder to manslaughter.
It requires no such thing.   It simply tells the jury they must
believe the killing "was done in sudden heat of passion, appar-
ently sufficient to make the passion irresistible," and nothing
more, and in this there was no error.   The law of self-defence
was embodied in other instructions given, and there was no
necessity for embracing it in the fifth charge, as it is insisted
should have been done.

It is said the seventh charge is erroneous, for the reason it
assumes the fact the killing was shown by the evidence.   If
it were conceded the criticism was just, it could do defendant
no possible harm, for the fact of the killing is not a disputed
fact in the case, and never was.   Defendant himself testified
he struck deceased a blow that felled him to the ground.   He
was taken up in an insensible condition, and died before the
next morning.   It is preposterous to even argue the wound
inflicted by defendant did not cause the death of the deceased.
That is a fact not in dispute by any one, and if it had been,
it was proved past all doubt.   Nor is this instruction liable
to the further criticism made upon it, that it conveys to the
minds of the jury the idea defendant could not sustain his plea
of justification unless the danger was not only apparently
imminent, but was actual and positive.   Fairly construed, it
asserts no such principle.

The objections taken to the ninth instruction are too subtle to find any support, either in reason or in law. Whatever warrant there may be for any criticism upon this instruction, it is obvious it contains nothing hurtful to the defence.

Lastly, it is said the eleventh instruction given for the People was calculated to mislead, in that it gave the jury the privilege of deciding that any element in the case, the most material as well as the most trivial, has been established by proof less in quantity than the law requires. The objection taken is broader than is warranted by any fair reading of the instruction; but if it is intended to say the jury should be required to believe every fact in the case had been proved, beyond a reasonable doubt, before they could find the accused guilty, such is not the law. In *Mullins* v. *The People*, 110 Ill. 42, this court said: "The reasonable doubt the jury is permitted to entertain must be as to the guilt of the accused, on the whole evidence, and not as to any particular fact in the case." The doctrine of the case cited has been restated and approved in the recent case of *Leigh* v. *The People*, 113 Ill. 372. The principle of these cases is conclusive of the same point in the case being considered.

The court refused certain instructions asked by defendant, but in doing so there was no error. All they contained that was proper to go to the jury had been given in other instructions, and it was not error to refuse to give the same thing a second time.

Every argument and suggestion of counsel in behalf of defendant has been thoughtfully and patiently considered, and no tenable ground is perceived on which a reversal of the judgment could be based. It is said defendant is guiltless of any criminal intent. How that is, could only be ascertained from what he did, as shown by the evidence, and that leaves no doubt upon the mind, of his guilty conduct. The widest latitude was permitted to the defence, on the trial, to introduce any and everything that would tend in the slightest

degree to extenuate the conduct of defendant. The principal witness for the prosecution was subjected to an unreasonably extended cross-examination, and every fact and circumstance that would tend in the remotest degree to impair the force of his testimony was permitted to go in evidence, and yet a jury coming from the vicinage have found defendant guilty; and this court, after the fullest examination, can not say the verdict is not warranted by the evidence. It is possible, and it may be true, some trivial errors have intervened at the trial. That may reasonably be expected in every protracted trial. When no error has intervened that affects the merits of the case in any substantial degree, the judgment will not and ought not to be reversed. Defendant has had a full and fair trial, and that is all he has any right to demand. If he is now to suffer punishment, it is on account of his own wrongful conduct, from the effect of which he can not expect to escape.

The judgment will be affirmed.

*Judgment affirmed.*