# THE STATE v. JAMES F. REED, Appellant.

### Division Two, May 20, 1913.

1. **GOOD REPUTATION: Impeachment by Specific Acts.** Where deceased became a witness through his dying declaration, evidence cannot be received of his reputation for peace and quietude until it has been directly attacked; and testimony of defendant that deceased was, at the time of the stabbing, engaged in an attempt to rob him, was not such an attack upon the reputation of deceased as to justify the admission of testimony, offered by the State in rebuttal, to the effect that deceased bore a good reputation as a quiet, peaceable, law-abiding citizen.

2. ————: **Easy to Prove.** Courts take judicial knowledge of the fact that it is much less difficult to prove a good reputation for a witness or litigant than to impeach his reputation, because evidence of bad reputation is usually founded on acts of wrongdoing or moral turpitude, and is of an affirmative character, while evidence of good reputation may be, and usually is, of a negative character, and rests upon the absence of any derogatory discussion of his conduct.

3. ————: **Presumption.** Where no evidence has been offered that a witness's or a party's reputation is bad, it ought to be presumed to be good, without proof.

Appeal from Jackson Criminal Court.—*Hon. Ralph S. Latshaw*, Judge.

REVERSED AND REMANDED.

*Frank M. Lowe*, for appellant.

It was error to permit State to bolster up the character of deceased, when no attack had been made upon his character. State v. Potter, 13 Kan. 316; State v. Thomas, 78 Mo. 343; State v. Barrett, 240 Mo. 175; State v. Nelson, 166 Mo. 203; State v. Jeger, 66 Mo. 180; State v. Jones, 191 Mo. 662; People v. Gallagher, 78 N. Y. Supp. 67; State v. Grant, 79 Mo. 134. "It is clearly error to permit the introduction of evidence

anticipatory of an attack on the character of a witness." State v. Patrick, 107 Mo. 155. "It is error to corroborate a witness before the witness has been attacked or impeached." State v. Creson, 38 Mo. 372. "Evidence of the bad character of defendant cannot be offered unless the character of defendant has been put in issue by evidence directly bearing upon that point." Grocer Co. v. Taggart, 78 Mo. App. 169; Crabtree v. Van Hoozier, 53 Mo. App. 411; State v. Grant, 144 Mo. 56; State v. Fogg, 206 Mo. 716; State v. Kelleher, 201 Mo. 638; 1 Wharton's Crim. Evid. (10 Ed.), sec. 491; Fulkerson v. Murdock, 53 Mo. App. 153; Ben v. State, 37 Ala. 103; Chase v. State, 46 Miss. 707; Pound v. State, 43 Ga. 128; State v. Thomas, 78 Mo. 343; State v. Jeger, 66 Mo. 180.

*John T. Barker*, Attorney-General, and *Ernest A. Green*, Assistant Attorney-General, for the State.

(1)    Under the third ground of his motion for a new trial, defendant contends that the court erred "in admitting testimony over the objection of defendant." The only ruling of the court in this regard to which an exception was saved is found in the bill of exceptions, where the following occurred: "Q. I will get you to tell the jury whether or not you are acquainted with his general reputation for being a quiet, peaceable and law-abiding citizen, or otherwise?" Mr. Lowe: "We object to that." The Court: "Objection sustained, for the reason it hasn't been put in issue in any way. Mr. Curtin: "This defendant testified that this dead man tried to rob him, and in view of the statement of Mr. Lowe that he was known as 'Horrible Red,' they have tried to assault his character, I think the State has a right to show what his reputation was." Mr. Lowe: "Nobody has attacked this man's character." Mr. Curtin: "I don't know how you can attack a man's character in a worse way than to show

that he was a highwayman." The Court: "I believe I will overrule the objection." Mr. Lowe: "Exception." (2) The court's remarks above quoted are in full accord with the decisions of this and the other appellate courts in this country. State v. Feeley, 194 Mo. 317; Thrawley v. State, 153 Ind. 375; Hussey v. State, 87 Ala. 121; Russell v. State, 11 Tex. App. 288; Sims v. State, 38 Tex. Crim. 637; State v. Vaughan, 22 Nev. 285; Pettis v. State, 81 S. W. 312; State v. Lejeune, 40 So. (La.) 632; People v. Gallagher, 75 App. Div. 39, 78 N. Y. Supp. 5.

BROWN, P. J.—Convicted of murder in the second degree in the criminal court of Jackson county, defendant appeals from a judgment of that court fixing his punishment at ten years in the penitentiary.

Defendant Reed, a laboring man, dropped into Kansas City on June 27, 1912, apparently for the purpose of spending a small surplus which he had earned in railroad construction work at another place. He spent the following day about the saloons of Fifth street in Kansas City, where he met Clyde Holland, the deceased.

The testimony of W. F. Hall, the chief witness for the State, is that about the hour of eight p. m. he (Hall) was standing in front of Pendergast's saloon, when defendant, with deceased and another man, a stranger to the witness, walked out of the saloon arm in arm. Defendant was walking on the right side of deceased, and the stranger on the left. The deceased's hands were down by his side, and neither of the three were saying a word. When they were about the center of the sidewalk in front of the said saloon defendant stabbed deceased in the stomach with a pocket knife, inflicting a mortal wound from which death ensued four days later. After the stabbing defendant walked one block and then ran, pursued by several individuals who caused his arrest. When arrested de-

fendant had in his pocket the bloody knife with which he stabbed deceased. He told the officer who made the arrest that he had cut a man named "Terrible Bill" or "Horrible Bill" at Pendergast's saloon.

The stranger who was with defendant and deceased when the stabbing occurred ran to the emergency hospital, procured a stretcher, and helped carry the deceased to the hospital for treatment. This stranger was not called as a witness by either side. He and Hall were the only eye-witnesses to the tragedy. Witness Hall in his preliminary examination testified that he was not sure that either the defendant or the stranger had hold of the arms of deceased when the stabbing took place, but on the final trial he testified that their arms were locked, thus justifying the impression that the memory of said witness had improved as to details by the lapse of time.

When taken to the hospital the inside of deceased's right hand was found to be severely cut, apparently with a knife. Eva Holland, a sister of deceased, testified that on the day he died deceased told her he could not live and made the following explanation of the killing:

" 'A man by the name of Jim Reed stabbed me.' I asked him, had they had any trouble or quarrel, and he said, 'None whatever.' I said, 'Where were you when this happened?' He said, 'At Pendergast's saloon.' He said, 'This man came up and seemed quarrelsome, and he walked away from him,' he said; 'he followed him and commenced to stab him before I could move.' He said, 'I grabbed the knife to protect myself and nearly severed my left hand.' "

Defendant testified in his own behalf that he saw deceased during the day of the killing; that about noon of said day deceased tried to take his money and watch away from him, but was interrupted or scared away by some other parties coming along the street. Defendant says that he was still loitering around the saloons

or in front of them until shortly after dark, when deceased and another man grabbed him and tried to run their hands in his pockets to get his money, whereupon defendant drew his knife, opened it quickly and struck deceased. That he stabbed deceased because the latter was getting his money and would not let him alone.

James McLaughlin, a witness for defendant, testified that he was in Pendergast's saloon during the twenty minutes immediately preceding the stabbing of deceased, and that the defendant and Holland were not in said saloon during that period.

In rebuttal, over the objections and exceptions of defendant, the State called two witnesses who testified that they were acquainted with Holland, the deceased, and that said deceased bore a good reputation as a quiet, peaceable and law-abiding citizen.

For reversal defendant relies chiefly upon the alleged error of the trial court in admitting evidence of the good reputation of deceased, whose reputation defendant contends had not been attacked.

The Attorney-General contends that the evidence of defendant to the effect that deceased was, at the time of the stabbing, engaged in an attempt to rob defendant was such an attack upon the reputation of said deceased as to justify the admission of evidence of his good reputation, citing: State v. Feeley, 194 Mo. l. c. 317; Thrawley v. State, 153 Ind. 375; Hussey v. State, 87 Ala. 121; Russell v. State, 11 Tex. App. 288; Sims v. State, 38 Tex. Crim. 637; State v. Vaughan, 22 Nev. 285; Pettis v. State, 47 Tex. Crim. 66; State v. Lejeune, 116 La. 193; and People v. Gallagher, 75 App. Div. (N. Y.) 39, 78 N. Y. Supp. 5. Defendant contends that the evidence of the attempted robbery was not such an attack upon the reputation of deceased as to justify the admission of the evidence complained of, citing: State v. Potter, 13 Kan. l. c. 416, and cases cited; State v. Thomas, 78 Mo. l. c. 343; State v. Barrett, 240 Mo. l. c. 175; State v. Nelson, 166

Mo. 1. c. 203; State v. Jaeger, 66 Mo. 1. c. 180; State v. Jones, 191 Mo. 1. c. 662; and People v. Gallagher, 78 N. Y. Supp. 1. c. 7.

This precise issue has not heretofore been before the appellate courts of this State. In the case of State v. Feeley, 194 Mo. 300, defendant was permitted to prove that the man whom he killed bore the reputation of being a quarrelsome and dangerous man when drinking; and that evidence was held to warrant the admission of evidence in rebuttal that deceased was a peaceable and law-abiding citizen. The Feeley case is unlike the one at bar in a very essential particular. In that case evidence was introduced by defendant for the direct and sole purpose of showing a bad reputation on the part of deceased (under certain conditions), while here the evidence only tends to show a specific criminal act on the part of deceased, and was introduced for the collateral purpose of mitigating or excusing the act of defendant in killing deceased.

The point at issue is not free from difficulty. The contentions of both the State and defendant are supported by respectable authority, and at first impression we felt like we would be glad to adopt the views of the learned trial judge, but, upon more careful reflection, we fear that, to do so, we would be making a precedent which would open up a Pandora's box of collateral issues to be let into every case, and thereby confuse juries even more extensively than under our present system.

There are always many collateral issues that resourceful attorneys could inject into all kinds of suits and which might throw some indirect light upon the real issue tendered by the parties. For instance, in a case where one man sues another for debt, if the plaintiff were permitted to prove that the defendant bears the reputation of refusing to pay his just debts, that evidence would work very advantageously in favor of plaintiff; or, if, in the same kind of a case, the defend-

ant were allowed to prove that the plaintiff bears the reputation of a contentious individual habitually suing people upon unjust or illegal claims, the effect of such evidence would likely be disastrous to plaintiff.

While evidence of the character mentioned would apparently tend to establish or disprove specific issues, it would in reality tend to prevent just verdicts by clouding the real issues with purely collateral issues which would draw the minds of the triers of fact away from the direct, legal and competent evidence in the case which they should consider most diligently in arriving at their verdicts.

It is undoubtedly true that a law-abiding citizen is much less likely to commit, or attempt to commit, crime than a man whose conscience is seared by the commission of many crimes; yet, it is likewise true that many very grave crimes are committed by people who have theretofore borne a good reputation, so that evidence of a prior good reputation is not a very potent shield against a charge of having committed a specific crime, though a jury might think differently where the evidence is conflicting and the issue arose collaterally. We take judicial knowledge of the fact that it is a great deal less difficult to prove a good reputation on the part of a witness or litigant than to impeach his reputation, for the simple reason that evidence of bad reputation is usually founded upon acts of wrong-doing or moral turpitude, and is of an affirmative character, while evidence of good reputation may be, and usually is, of a negative character, simply showing that the neighbors of a party whose reputation is in issue have not heard anything said derogatory of his conduct. [40 Cyc. 2648.]

Coming back to the concrete facts of this case, the evidence of Holland, the man whom defendant killed, went to the jury through his dying declarations as narrated by his sister in the State's evidence in chief.

That fact alone made it competent for defendant to attack deceased's reputation, if he had any general evidence that such reputation was bad.

"To affect their credibility it is competent to show feelings of hostility on the part of the declarant toward the accused, to show the condition of his mind subsequent to the declarations . . . to prove his bad character, and to prove contradictory and conflicting statements." [1 Wharton's Criminal Evidence (10 Ed.), sec. 298, p. 580.]

As no such evidence was offered, why cannot we presume, without proof, that deceased's reputation was good?

It is certainly as reasonable for courts and juries to presume that the deceased was a law-abiding person, as to indulge the presumption that the defendant on trial is innocent, notwithstanding a specific charge of crime has been preferred against him by a grand jury or sworn prosecuting officer. The law indulges the presumption of honesty and a willingness on the part of every citizen to obey the law until the contrary is established by convincing proof. [Long v. McDow, 87 Mo. 197; Maysville v. Truex, 235 Mo. 619.]

The admission of the evidence touching Holland's good reputation in this case violates a well-known and highly respected rule of law—that evidence cannot be received to bolster up the testimony of a witness whose reputation has not been directly attacked. [State v. Fogg, 206 Mo. l. c. 716.] (As we have seen, deceased became a witness through his dying declaration.) No evidence raising a collateral issue of doubtful propriety should be admitted which violates any well-known rule of law.

The dying declarations of deceased were in conflict with the evidence of the State's chief witness, Hall, and the fact that deceased's hand was cut further tended to discredit Hall, who claimed to have seen de-

ceased murdered without any struggle or demonstration on his part. Being forced to rely upon this conflicting evidence, the prosecuting attorney evidently thought the best plan to secure a conviction was to bolster up the dying declarations of Holland and rely upon those declarations for his conviction. In admitting that testimony the court committed an error prejudicial to defendant.

After carefully considering the authorities cited and the arguments of the parties, we have arrived at the conclusion that the law of this case was correctly announced by the late United States Supreme Judge Brewer, while a member of the Supreme Court of Kansas, in the following language:

"Appellant insists that the court erred in allowing the State to introduce evidence of the character of the deceased as a quiet and peaceable man. It appears that the deceased was killed in an affray—that this was the second quarrel upon the same afternoon between the deceased and defendant, others participating. . . . On the trial and before closing their case the prosecution was permitted over objection to ask witnesses who had testified that they knew the deceased, this question: 'State if you knew his general reputation for being a peaceable, quiet and law-abiding citizen.' And the witnesses testified that he was a peaceable, quiet and law-abiding man. No attack was made by defendant at any time during the trial on the character of the deceased, and no attempt to show that he was a quarrelsome or turbulent man. . . . If the defendant may show that the deceased was a known quarrelsome, dangerous man, why may not the state show that he was a known peaceable, quiet citizen? The argument is not good. The books are full of parallel cases. The accused may in some cases show his own good character. The State can never in the first instance show his bad character. A party can never offer evidence to support a witness's credibility until

it is attacked. The reasons for these rules are obvious. Such testimony tends to distract the minds of the jury from the principal question, and should only be admitted when absolutely essential to the discovery of the truth. Again, the law presumes that a witness is honest, that a defendant has a good character, and that a party killed was a quiet and peaceable citizen, except so far as the contrary appears from the testimony in the case; and this presumption renders it unnecessary to offer any evidence in support thereof." [State v. Potter, 13 Kan. l. c. 422.]

In 21 Cyc. 907, the rule is announced as follows: "Ordinarily the character or reputation of the deceased is not involved in the issue of murder and proof relative thereto is generally inadmissible."

For the error of the trial court in admitting evidence of the good reputation of Holland (the deceased), when such reputation had not been placed directly in issue by defendant, we reverse the judgment and remand the cause for new trial.

*Walker* and *Faris, JJ.,* concur.