THE STATE v. WALTER A. BOLHOFNER, Appellant.—82 S. W. (2d) 894.

Division Two, May 7, 1935.

1156

*Cullen, Fauntleroy & Edwards* for appellant.

*Roy McKittrick*, Attorney General, *Wm. Orr Sawyers* and *John W. Hoffman, Jr.*, Assistant Attorneys General, for respondent.

LEEDY, J.—Appellant was charged by indictment with murder in the second degree in having shot and killed one Emil Probst in the city of St. Louis on September 3, 1931. The jury found him guilty of manslaughter, and by its verdict assessed his punishment at imprisonment in the penitentiary for a term of eight years. From the judgment rendered thereon, after unsuccessful motion for new trial, he has appealed.

Appellant is a married man, and at the time of the trial was forty-nine years of age, and had five children whose ages ranged from three to twenty-four years. It appears that sometime prior to the homicide Mrs. and Mrs. Bolhofner had separated, and in September, 1930, appellant was living, apart from his family, at 2615 Potomac in the city of St. Louis. Thereafter, and in the following December, his wife and children moved to that address, he having taken up an abode elsewhere. The flat mentioned was owned by the mother and father of the deceased, with whom he lived in the upper, or second story flat known as 2615a Potomac. The deceased was unmarried, and at the time of his death was twenty-seven years of age, six feet tall, and weighed about two hundred and ten pounds. We infer that the Bolhofners were not acquainted with deceased, Emil Probst, prior to the time appellant first rented the premises mentioned, which was in September, 1930. Appellant visited his estranged wife and their children at the Potomac Avenue address with some degree of regularity—perhaps once or twice a week, and it was on one of such visits that this tragedy occurred.

On the day in question, appellant arrived at his wife's apartment about 11:45 o'clock, A. M., had lunch and supper there, and visited with his wife and children until about eight o'clock, P. M. Appellant

had previously charged his wife with having improper relations with deceased, and such accusations had been communicated to the latter, who stoutly denied them. Appellant testified to a state of facts, the details of which we need not relate, but which, if believed, were abundantly sufficient to sustain his charges. It was for the purpose of discussing these alleged relations, or at least appellant's charges with respect thereto, that deceased, his mother (Mrs. Lena Probst), Mrs. Bolhofner and appellant, at about eight o'clock, P. M., went to the workshop of deceased in the basement of the Potomac Avenue address on the occasion in question. That the meeting was arranged at the direction of deceased, and that appellant went there at the express invitation of deceased, communicated through his mother, Mrs. Lena Probst, is not controverted. As to what transpired in connection with the ensuing altercation, there were two conflicting accounts— one narrated by Mrs. Lena Probst, and the other by appellant.

For the purpose of disposing of the questions raised on this appeal, it is sufficient to say that testimony on behalf of defendant tended to show self-defense; that deceased applied vile epithets to appellant, and the latter shot twice for the purpose of frightening deceased, and shot the third and fatal shot only when deceased was reaching for a pistol in his hip pocket.

I. Error is assigned in the giving of three instructions, namely, "the second part of Instruction No. 1," and Nos. 4 and 5.

(A) Instruction No. 1 submitted the hypothesis of murder in the second degree, and the particular portion complained of reads as follows:

"SECOND. The Court further instructs you that if you find from the evidence that the defendant, Walter A. Bolhofner, intentionally killed the deceased by shooting him with a pistol in the manner set forth in the foregoing instructions, and that such pistol was a deadly weapon, then the law presumes that such killing was murder in the second degree, in the absence of proof to the contrary, and it devolves upon the defendant to meet or repel that presumption, unless such presumption is met or repelled by the evidence introduced on behalf of the State."

Appellant argues that as the homicide was witnessed by eyewitnesses, there is no room for any presumption that the offense was murder in the second degree, and that it was error to instruct that such a presumption existed as a matter of law. It was undoubtedly error to give the instruction. A counterpart of it was under consideration in State v. Burns, 278 Mo. 441, 213 S. W. 114, and it was there held: "This instruction regarding presumption of guilt in trial for murder in the second degree is never permissible when the evidence shows what the facts are as it did in this case. [Citing cases.]" But the learned Attorney General takes the position that the point was not preserved by the motion for new trial, and is,

therefore, not properly before us. However that may be, we think the instruction, although erroneous, was harmless, and this because the conviction was not had thereunder, but for a lesser offense. [State v. Ashbrook (Mo.), 11 S. W. (2d) 1037.]

■ (B) As to Instruction No. 4, which told the jury that one "who willfully, that is, intentionally, uses upon another at some vital part, a deadly weapon, as a pistol, must in the absence of qualifying facts, be presumed to know that the effect is likely to be death; and knowing this, must be presumed to intend death, which is the probable and ordinary consequence of such an act." The complaint respecting the instruction as stated in the motion for new trial is as follows: "The Court erred in giving to the jury instruction number four (4) dealing with the presumption arising from the use of a deadly weapon. The defendant testified in his own behalf that he did not intend to kill deceased." We hold the statement of this ground for new trial, based on said instruction, is not in compliance with the statute requiring the alleged errors to be "set forth in detail and with particularity" (Sec. 3735, R. S. 1929, sec. 3735, 4 Mo. Stat. Ann., p. 3275) and is, therefore, not before us for review.

(C) The same defect inheres in the motion with reference to complaints leveled against Instruction No. 5, touching defendant's extrajudicial statements. Since the trial of this case in the circuit court, we have had occasion to re-examine the question of the propriety of giving similar instructions, and upon another trial the court will doubtless conform to those rulings. [See State v. Duncan, 336 Mo. 600, 80 S. W. (2d) 147; State v. Johnson, 333 Mo. 1008, 63 S. W. (2d) 1000; State v. Dollarhide, 333 Mo. 1087, 63 S. W. (2d) 998.]

■ II. In rebuttal, the State, over the objections and exceptions of defendant, introduced witnesses to show the good reputation of deceased for peace and quietude. The objection was that the character of deceased had not been attacked, and was not in issue, and, therefore, any attempt to bolster it up by evidence tending to show his good reputation in the respects mentioned was wholly improper. It is contended that the admission of such testimony constituted reversible error, and in support of the proposition, appellant cites the following cases: State v. Ross (Mo.), 178 S. W. 475; State v. Dixon (Mo.), 190 S. W. 290; State v. Reed, 250 Mo. 379, 157 S. W. 316. The respondent does not challenge the general rule announced in those and other cases to the effect that evidence of the good character of the deceased in a homicide case is inadmissible unless it is put in issue by defendant. Here it is conceded that no direct attack was made on the character of deceased—that is, no witnesses testified to his general reputation for being a violent, turbulent or quarrelsome man. The State asserts

that defendant by his own direct examination, as well as by the testimony of his son, made such an attack upon deceased's character, in a collateral sort of way, as permitted the State to show in rebuttal that deceased's reputation for peace and quietude .was good. .This contention grows out of certain facts testified to by appellant and his son, Lester, touching deceased's conduct prior to, and at the time of the shooting. It was shown that deceased called appellant on the telephone on the Sunday next preceding the shooting, and in their conversation deceased said, "Say, Walter, I want to speak to you about what you are saying about my relations with your wife." In that connection, defendant testified further: "His voice and his talk was very rough, as I say, excited, I recognized it as excited." That on the afternoon of the day of the tragedy, at about five o'clock, appellant saw deceased come to the gate at the rear of the Potomac Avenue address, at which time appellant was standing in the back door of the lower flat. That appellant recognized deceased, and said "Hello, Emil," to which deceased replied "Hello, there." That deceased "turned around in his walk—he didn't stop, but he turned around and looked at me as though he was out of humor and he says 'I want to talk to you after while.' I said, 'All right, Emil. I will be glad to talk to you.'" Lester, the son, called on behalf of appellant, testified that between six and six-fifteen o'clock, P. M., he went upstairs to the Probst flat for the purpose of using the telephone, and while there deceased inquired if appellant had said anything to the witness about him (deceased), to which the witness answered "No." Then deceased said, "Sometimes he (meaning appellant) makes me so mad I could kill him." It may be said there was no evidence that the statement just quoted was communicated to appellant

In State v. Ross, supra, relied on by appellant, rebuttal evidence of good character of deceased was held to be reversible error, the court saying, "the facts are squarely against" the contention "that defendant introduced evidence assailing the character of the deceased, and that such fact justified the introduction of evidence by the State as to his (deceased's) good reputation. Whether or not, if the evidence on that point had been introduced on the initiative of the defendant, it would have been such an assault on the character of deceased as to justify introduction of the evidence in support of his reputation, we do not decide."

In the case of State v. Dixon, supra, the conviction was for murder in the second degree, growing out of a drinking bout, and a game of craps in which defendant, deceased and others were participants. A plea of self-defense was interposed. The case was reversed, the court holding that evidence tending to show deceased had carried a pistol at some indefinite time, and on the day of the tragedy was drunk and ran his horse along the public road, and yelled

while doing so, was not such an attack as to make admissible evidence of the good character of deceased.

It was contended in State v. Reed, supra, that evidence of defendant to the effect that deceased was, at the time of the stabbing, engaged in an attempt to rob defendant was such an attack upon the reputation of deceased as to justify the admission of evidence of his good reputation. This court declined to adopt that view, but reversed and remanded the case on the sole ground that it was error to admit "evidence of deceased's good reputation when such reputation had not been placed directly in issue by defendant." So much for the cases relied on by appellant.

To sustain its position, the State cites State v. Woodward, 191 Mo. 617, 90 S. W. 90, which holds that defendant in cross-examining a State's witness, opened up the subject of good reputation of the deceased it was, therefore, not error to permit the State to rebut such testimony by evidence of deceased's good reputation. That case was reversed and remanded on other grounds, but in the concluding sentence of the holding just stated, the court took occasion to say, "However, upon a retrial of this cause, unless the reputation of the deceased is put in issue, the court should exclude any evidence as to his general reputation."

As to what constitutes an attack on the reputation of deceased so as to make admissible evidence of his good reputation there is a lack of uniformity in the holdings. "No general rule can be laid down for the determination of what will be held to constitute an attack by the defendant upon the character or reputation of the deceased, so as to 'open the door' for rebuttal on behalf of the people; but each case will be decided according to the circumstances thereof. Courts have disagreed, and even the judges of the same court, with reference to some of the questions so presented." [Note 124 Am. St. Rep. 1035, citing, among many others, Kelly v. People, 229 Ill. 81, 82 N. E. 198, 12 L. R. A. (N. S.) 1169, a leading case; see, also, 13 R. C. L., p. 916, sec. 219.]

In sustaining the propriety of rebuttal evidence touching the good character of deceased, where, as here, the attack was made collaterally, it was held by the Supreme Court of Illinois: "What defendant proved concerning deceased was equivalent to proving his general character as a violent and fighting man, and there was certainly no serious error, if there was any at all, in permitting the prosecution to rebut such evidence of character by proving, as was done, his general character as a quiet and peaceable man." [Davis v. People, 114 Ill. 86, 29 N. E. 192.]

In Kelly v. People, supra, it was held in effect that testimony offered by defendant tending to show that deceased was a "very strong, muscular man, and well capable of taking care of himself" was not such an attack as to make it competent to rebut such evi-

dence by proving the general reputation of the deceased as a peaceable and quiet man.

The case of DeWoody v. State (Ariz.), 193 Pac. 299, is, on the facts, more nearly in point than any of the numerous cases examined in our somewhat extensive search of the authorities. In it the sole question discussed was on the point here involved. Defendant was convicted of murder in the first degree under a plea of self-defense. Defendant testified "that when he was in the act of shoveling dirt from an irrigating ditch the deceased approached him in an angry manner, and said, 'If you do that I will kill you, damn you. I will shoot you,' at the same time making a gesture with his right hand as if to draw a gun from his hip pocket, and defendant believing his life was in imminent danger, fired three shots" killing deceased. In reciting the facts, it was further stated, "The State in its case in chief introduced evidence tending to show a number of quarrels, more or less violent in their character, between the deceased and the defendant, growing out of business affairs. . . . The defendant . . . gave testimony tending to explain the cause of the quarrels. . . . He gave his version of the quarrels, and in so doing he stated substantially that the deceased kept 'quarreling' and 'fussing' with him about the pay checks, that he would approach the defendant in a very ugly manner and ugly way about the checks every morning when the defendant went to open the store and sweep it out, and every evening when he would go in the store, after working hours, that the deceased was excited and would not listen to reason, and when defendant attempted to show him where he was unreasonable he would not listen, but got all the 'madder.'"

In disposing of the case, the court said, "The question therefore for decision is: Was the evidence of the defendant, giving his version of the quarrels and tending to show that the deceased was the aggressor and acting in an ugly manner and way during the quarrels, and would not listen to reason, but grew madder, such an assault on the character of the deceased as would permit the State to introduce rebutting testimony of his good character? We think not. Evidently this testimony was not intended to and did not reflect on the general character of the deceased as to quarrelsomeness, turbulence, or violence, but only as to his manner and demeanor toward the defendant during the quarrels. The testimony was not introduced, and it was not admissible to prove general reputation, and the circumstances of ill temper exhibited by the deceased and testified to did not show or tend to show that the deceased's character for peace and quiet was bad. The full scope or effect of the testimony was only to show that the two men fell out and quarreled over a business matter, and one exhibited bad temper and ugly conduct. This he might do and yet not be a quarrelsome, turbulent, or violent man. Certainly it must be conceded that the defendant had the right to give his version

of the quarrels, which the State had already put in evidence against him, and if in doing so some acrimonious demeanor or conduct of the deceased was made to appear it cannot be justly and reasonably said that an attack on the character of the deceased had been made in the sense that the State could introduce proof of good character in rebuttal."

We think there was no such attack upon the character or reputation of deceased as "opened the door" for the reception of the evidence complained of, and, that it was error to admit it. Furthermore, from reading the record, the trial theory of the State respecting this evidence would seem to have been bottomed on the fact that defendant had produced numerous witnesses who testified to his good reputation. The bill of exceptions shows that when the evidence complained of was offered in rebuttal, the following objection was made: "I object to that on the ground that the character of the deceased is not in issue here and that this is a mere attempt to bolster it up when it isn't in issue." To which the assistant circuit attorney replied: "I object to the statement of counsel that this is an attempt to bolster it up. *We have heard a lot of character witnesses for the defendant.* We are entitled to show that the deceased was also a man of good character—good reputation for peace and quiet, honesty and veracity and morality." What was said in the Dixon case, supra, is particularly appropriate here: "While the admission of this testimony may not have hurt defendant, who, on the whole, the record considered, apparently fared as well as he deserved, yet we cannot at this distance say what effect this error might have had upon the triers of fact."

III. The other point briefed is that error was committed in refusing to permit defendant to testify that he had been informed that deceased intended to attack. Proof was offered of a conversation between appellant and his wife, which embraced matters other than threats, to which the State objected, and was sustained. But in passing on the objection, the record shows the court made the following statement which qualified the ruling: "The COURT: I have no objection to you developing the threats that may have been carried back to the defendant, but that doesn't necessarily follow that I must admit any evidence of what he told his wife. There is another step that you can show." In this situation, the record not sustaining appellant's contention with respect to what was actually excluded, he is in no position to urge the point now made.

For the reasons noted, the judgment is reversed and the cause remanded. All concur.